**Bernard LITMAN, Plaintiff-Appellee,**

v.

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Defendant-Appellant.**

No. 83–5025.

United States Court of Appeals, Eleventh Circuit.

Aug. 27, 1984.

Rehearing and Rehearing En Banc Denied Oct. 9, 1984.

Kimbrell, Hamann, Jennings, Womack, Carlson & Kniskern, P.A., Carl K. Hoffman, Daniels & Hicks, Mark Hicks, Miami, Fla., for defendant-appellant.

Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Joel D. Eaton, Miami, Fla., for plaintiff-appellee.

Before FAY and ANDERSON, Circuit Judges, and MARKEY *, Chief Judge of the Federal Circuit.

FAY, Circuit Judge:

Appellant, Massachusetts Mutual Life Insurance Company (herein Mass Mutual), appeals from a final judgment in favor of one of its former general agents, appellee Bernard Litman, in the amount of $2,500,-234. A jury, sitting in the United States District Court for the Southern District of Florida, awarded $2,000,234 for the breach by Mass Mutual of an orally modified gen-

eral agent's contract in the company's 1977 termination of Litman. The jury awarded $100,000 in damages for a slanderous statement made by a Mass Mutual spokesman to a prospective employer who had solicited information regarding Litman at Litman's request. An additional $150,000 was awarded for slander resulting from statements made by two Mass Mutual employees to Litman's former insurance salesmen as to the reason he was terminated. The jury also awarded $250,000 in punitive damages for slander.

Mass Mutual presents five major issues for review:

(1) Whether there is substantial evidence to support the jury's findings of a valid oral modification to the written general agent's contract and of promissory estoppel; (2) whether a new trial is required on the issues of modification and promissory estoppel; (3) whether the slander award based upon the statement made by a Mass Mutual executive to Litman's prospective employer should be reversed; (4) whether the slander award for the statements made by Mass Mutual employees to Litman's former insurance salesmen should be reversed; and (5) whether the record is sufficient to sustain an award of punitive damages. Finding that the statement made by Mass Mutual to Litman's prospective employer was invited and as such not actionable as slander, we reverse the district court's award of $100,000 based upon this statement. Accordingly, we hold that the issue of punitive damages, damages which were in part based upon such slander, must be returned to the district court for a new trial. We find appellant's remaining claims to be without merit and therefore affirm the district court's decision as to the remainder of the judgment.

I. FACTS AND PROCEDURAL HISTORY

Bernard Litman, a former life insurance agent for Penn Mutual Insurance Company

---

* Honorable Howard T. Markey, Chief Judge, U.S. Court of Appeals for the Federal Circuit, sitting

by designation.

in New York, joined Mass Mutual as a salesman in 1957. He moved to Miami in 1959 and became a staff supervisor and later an assistant general agent in the south Florida area. Litman was recruited by James Martin, then Mass Mutual's vice president in charge of sales, to become a "general agent" of the company.[1] He was given the option by Martin to become a "formula" or a "non-formula" general agent. Under the "formula" arrangement, as explained to Litman, the company pays all of the general agent's expenses and has complete control over the agency; under the "non-formula" arrangement, Mass Mutual contributes to the payment of some expenses for a limited period of time, but the general agent remains autonomous, personally responsible for most of the expenses of developing and operating his agency. Litman elected to proceed as a non-formula general agent.[2]

Following Litman's initial recruitment in Miami, he was invited to the home office and presented with a standard form "General Agent's Contract." Litman signed the contract on January 15, 1962, in Springfield, Massachusetts, for an agency located in Miami, Florida. The contract was signed on behalf of Mass Mutual by the company's vice-president in charge of production. Litman was told during his subsequent "indoctrination" that a general agency required a tremendous initial investment of time, energy and money; as a result, he became extremely concerned about the termination provision in the contract, which appeared to him to provide that Mass Mutual could terminate him simply by providing him with a written notice of termination. Reluctant to proceed on this basis, Litman asked Robert Albro, the agency secretary of Mass Mutual and the officer who had originally presented Litman with the contract for execution, for a "guarantee" that he would not be terminated but for a legitimate reason. Litman testified that he recalled Albro's response to be as follows:

As best I recall, Mr. Albro said to me that this would be a much more difficult question to answer if he were dealing with a general agent, a prospective general agent coming from another company. But the relationship that he and I had, the respect that we had and assumed that I had for the respect of Mass Mutual made it very easy. That there was no way in the world my contract would be terminated on the whim of anybody. That he was fully aware of the time, effort, and money that I had to put into it. And that I was going to run my own shop. He was careful to point out, although you have no reason to assume it would occur, that because I was responsible for handling large amounts of money, responsible for submitting and transmitting information to the home office on which they made decisions to underwrite insureds, that any act of fraud of that type or lack of fiduciary capacity would be a cause and the only cause for terminating my contract.

Record Vol. 7 at 175–76. Litman further testified that he "agreed to that," that he "relied upon that," and that he "agreed to go forward" because of the statement. Record Vol. 7 at 174–75. Albro testified that he had no recollection of a meeting with Litman in 1962; that he would never have told any general agent that he would

1. Under Mass Mutual policy, a "general agent" contracts directly with the company and is responsible for recruiting, contracting with, and managing the individuals who actually "sell" the company's insurance products. The "salesmen", who are employees of the general agent rather than of the parent company, are referred to as "agents" in the industry and throughout this opinion.

2. Testimony at trial adduced that a non-formula general agent customarily begins his business in a precarious, cash-poor financial position because the bulk of his expenses are not paid by the defendant and because the bulk of his compensation is deferred. Specifically, when an insurance policy is sold by one of a non-formula general agent's "agents," the general agent's commission is not paid immediately; rather, a portion of it is paid in the second year of the policy's existence, and the remainder is paid out incrementally over the next fourteen years, as long as the policy continues in existence. Half of the commissions are vested, i.e. they are payable even if the general agent is terminated or dies; and half are non-vested, i.e. in the case of termination or death they are retained by the company. R.Vol. 7 at 158–60.

only be terminated for fraud; and that he may later have told the plaintiff that a general agent would only be terminated for "good cause." Record Vol. 9 at 617–24.

The bulk of the evidence in the record relates to the ongoing relationship of Litman and Mass Mutual from 1962 through his ultimate termination by the company fifteen years later. Litman borrowed extensively in order to capitalize his business both through local banks and from Mass Mutual (in the latter instances, using his vested commissions as security for the loan). Furthermore, Litman's agency in its early years was characterized by rapid growth and therefore rising expenses, generating a cash-flow shortage. Not wishing to discourage growth in production by its general agencies, Litman was frequently asked to control this inherent problem by reducing his expenses. From the beginning of the relationship through 1975, Litman's primary contact with Mass Mutual was with Frank Meeske, the company's "Director of Agencies." It is uncontroverted that Litman's agency was quite successful during its first decade in terms of generating policies and premiums; the production number showed a steady increase throughout each year of operation. Meeske, however, was concerned that Litman was spending too much of his income on his employees, and Meeske maintained the pressure on Litman to control his expenses.

In 1974, the bottom fell out of the real estate market in south Florida, and drasti-

cally altered the insurance business in general. Three of Litman's agents departed and his agency's total production for the years 1974–1976 resultingly dropped from its production level in 1973. This downturn generated concern at the home office, and in 1975 Litman was called to Mass Mutual's Springfield headquarters to attend a meeting at which he was told that he was "bankrupt." During the meeting, Litman conferred with the company's chief financial planner, Emmett Jergensen, who was intimately familiar with Litman's past. Jergensen worked up a conservative, detailed projection of Litman's anticipated income and expenses through Litman's retirement in 1986, and provided a "recovery plan" (which included an additional loan from the company) intended to solve Litman's perceived financial problem. Litman agreed to abide by the plan.

Meeske retired in 1976 and Walter (Derby) Wilson was placed in charge of the agency division. Berk Ingram was also promoted to the position of executive vice-president at this time. Both Wilson and Ingram questioned Litman's capabilities and considered his autonomy harmful to Mass Mutual. The loan request contemplated by Jergensen's projection came under scrutiny, and the company officers contemplated a strategy whereby Mass Mutual would have much greater control over Litman's agency.[3]

Soon thereafter, Wilson called Litman to a meeting at the home office. Upon arrival, Litman was handed a letter (dated

---

**3.** This intent is exemplified in a memorandum written on March 24, 1977, by Ingram to Wilson in connection with Litman's loan request. The memorandum begins:

As we discussed at length today, Jim Martin rather reluctantly said he would grant an additional $20,000 formal loan to Bernie Litman. The real problem we have with Bernie and his agency far transcends an additional $20,000. Bernie has somehow or other stayed on his feet through the regimes of Jim Martin, Bill Clark, Berk Ingram and, so far, Derby Wilson. Unless he makes basic changes, (which I think is improbable if not impossible), his luck will probably run out approximately two years from now.

In a way, I look upon this additional grant as an opportunity to give you, Bob DeValle and

Gerry Griffin a chance to get into that agency and Mass Mutualize it to such an extent we will minimize Bernie's chances of taking many of his good agents with him to another company. Furthermore, even if his clock does stop two years from now and if, in fact, we have made him make his monthly repayments on his debt and if, in fact, the agency does do well thus increasing Bernie's vesteds and if we have a much better control over his agency, then perhaps we will be in a better position financially in our deal with him than if he were allowed to fail at this time ....

The remainder of the memorandum enunciates a list of things to be done to "Mass Mutualize" Litman's agency. Plaintiff's Exhibit 6.

March 28) in which Wilson had demanded that Litman comport his activities in numerous areas to the dictates of "the company." Litman was quite upset by the letter and refused to sign it. Wilson also produced a check in the amount of the pending loan request and took Litman into the office of James Martin, the Chairman of the Board. Martin stated that authorization for the loan had not been obtained, refused to permit delivery of the check, and instructed Litman to meet with Jergensen to work out a new "recovery plan." Litman did meet with Jergensen, but returned to Miami without the check and later learned that the revised plan had been disapproved.

Litman then received another letter (dated May 6) from Wilson, which reiterated several of the demands made in the March 28 letter and which also insisted that Litman's employees "identify ... Mass Mutual on the telephone" when answering it. Litman refused to sign this letter as well. On May 25, proceeds of a new $20,000 loan were delivered.

On June 13, Litman wrote Wilson a letter expressing his frustration at the methods by which he had recently been treated by the company. Because this letter was not answered, Litman phoned G. Barton Griffin, Wilson's assistant, on June 22 to reiterate his complaints; Litman told Griffin that while he was "not negotiating with any other company," Mass Mutual's treatment of him had prompted Litman to "seek other options." Griffin advised Wilson that he assumed Litman to be negotiating with other companies. On the same day, Wilson called Litman and advised him that he had heard of Litman's employment negotiations with other companies; Litman denied such negotiations and explained that he had made appointments with representatives of other companies only to obtain advice concerning the problem Litman was having with the Mass Mutual officers. Wilson insisted that Litman cancel the appointments, threatening that otherwise Litman's resignation would be requested. Litman stated that he was unable to do that, and the conversation ended. The next day, Wilson instructed Griffin and Robert DeValle to go to Miami in order to ask for Litman's resignation. Thereafter, DeValle and Griffin met with Litman; Litman was terminated, effective June 28, 1977, when he refused to resign.

After the termination, DeValle held a meeting with the clerical and secretarial staff of Litman's agency in order to announce the agency's termination and to assure the staff that their jobs were secure. A second meeting was held with the agency's insurance agents, during which essentially the same announcement was made.

Within the next two or three days, Litman claimed that Griffin and DeValle met with each of his agents and told some of them upon inquiry that Litman was terminated because he had "serious financial problems" or because he was a "lousy" or "bad businessman." Record Vol. 7 at 234. Griffin and DeValle testified that the reasons for these discussions were to keep good agents from leaving, to squelch rumors, to alleviate concern about each agent's future and to answer their questions as to why Litman was terminated. Record Vol. 9 at 632–36, 670. DeValle also indicated that Litman gave his permission to tell the agents the reason for the termination; however, Litman denied such permission. Record Vol. 9 at 650.

Subsequent to Litman's termination, Litman applied to several companies in pursuit of a general agency position. One of the companies contacted was Travelers Insurance Company, whose negotiations with Litman were conducted by James Farney, Travelers' National Director of General Agencies. Litman directed Farney to contact James Martin, Mass Mutual's Chairman of the Board and Chief Executive Officer, as a reference, despite being told by Mass Mutual upon termination that he had "... very serious financial problems." Farney called Martin and was told that their discussions were confidential. Farney testified that Martin was very complimentary of Litman in terms of Litman's recruitment, training and the quality of Litman's business. Farney then inquired as to Mass Mutual's "problem" with Litman, and Martin responded that Litman

"... didn't pay his business bills." Record Vol. 7 at 130–31. Martin did not discuss Litman's termination in detail with Farney and Farney testified that he "felt confident that [Litman's credit practices] were not a problem." Record Vol. 7 at 131–32. Litman was made a general agent for Travelers on September 15, 1977, a position which he held during the pendency of trial in this action.

On June 19, 1978, Litman filed a four-count complaint against Mass Mutual in the Dade County Circuit Court. Count I alleged the wrongful breach of Litman's written career contract with Mass Mutual. Count II alleged the wrongful breach of the employment contract as orally modified. Count III sought recovery for slander, alleging as improper both the statements made by Griffin and DeValle to Litman's agents and the comments by Martin to Mr. Farney, and Count IV prayed for an accounting.

The case was removed to the United States District Court for the Southern District of Florida and Mass Mutual filed a motion to dismiss. The district court dismissed Count I on the grounds that, by its terms, the contract was terminable at will. The court denied the motion to dismiss the remaining counts and stated in its order that Count II would also sustain a cause of action for promissory estoppel.

Thereafter, Mass Mutual answered the complaint, denied the material allegations and specifically asserted several affirmative defenses. The trial court later denied the company's motion for summary judgment directed to Count II. As to Count III claiming slander, Litman's motion for summary judgment was denied in part and granted in part. The court ruled as a matter of law that if the jury were to find that the statements attributed to Griffin and DeValle were made and published, such statements are slanderous *per se*. The statement made by James Martin was found to have been published and the court held that it was slanderous *per se*.

The case was tried before a jury commencing on April 19, 1982. The court denied the company's motion for a directed verdict at the conclusion of the plaintiff's case and at the conclusion of all the testimony. A final judgment was entered on April 30, 1982. The defendant on May 10, 1982, filed motions for judgment notwithstanding the verdict and for a new trial. The court denied the defendant's post-trial motions in a December 7, 1982 order. On January 4, 1983, Mass Mutual appealed to this court.

## II. SUFFICIENCY OF THE EVIDENCE TO SUPPORT JUDGMENT ON BREACH OF CONTRACT CLAIMS

### A. *Albro's Authority*

■ Mass Mutual claims that it is entitled to judgment on Litman's claim that it breached the employment contract at issue, as orally modified by Albro, because Albro's corporate "authority" to enter into such an agreement was not proven. It is true that under Massachusetts law,[4] the burden is on a plaintiff to show that an employment contract was either made or ratified by an officer having authority to bind that corporation. *Rydman v. Dennison Manufacturing Co.*, 373 Mass. 855, 366 N.E.2d 763 (1977); *Lucey v. Hero International Corp.*, 361 Mass. 569, 281 N.E.2d 266 (1972); *Thali v. Friden Calculating Machine Co.*, 338 Mass. 67, 153 N.E.2d 658 (1958). However, the record clearly forecloses this challenge.

■ In the district court proceedings, Mass Mutual never advanced the contention of lack of authority until late in the game; we therefore find them to have waived this issue for the purposes of appellate review. The company did not raise this issue in its answer; it was not mentioned during Litman's deposition; further, it was not listed in the pre-trial stipulation as an issue of fact to be tried. The question of authority was not raised until the close of the plaintiff's case, at which time

---

**4.** It is uncontroverted that the breach of contract issues are to be decided under Massachusetts' law, as stipulated in the general agent's contract signed by Litman, with the measure of damages as to all claims and the slander issues to be determined under Florida law.

the defendant moved for a directed verdict on this ground. The court summarily denied this motion. A fair reading of the record convinces us that the trial court concluded this issue had not been properly reserved for trial and was thus waived. Under the facts of this case, we find no error. *See* 9, C. Wright & A. Miller, *Federal Practice and Procedure* § 2534 (1977); 5A J. Moore & B. Ward, *Moore's Federal Practice* ¶ 50.05[1] (2d ed. 1983). The defendant again moved for directed verdict at the close of all the evidence but did not assert this ground for judgment in that motion. This ground was included in defendant's brief supporting the motion for judgment n.o.v. However, as this motion is technically only a renewal of the motion for a directed verdict made at the close of the evidence, a party cannot assert a ground that was not included in its motion for a directed verdict. *Sulmeyer v. Coca Cola Co.*, 515 F.2d 835 (5th Cir.1975), cert. denied, 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 341 (1976);[5] *see* Wright & Miller § 2537; *Moore's Federal Practice* ¶ 50.08. At this point it appears there was a double waiver of this issue.

Further, Mass Mutual did not object to the trial court's jury instructions on the ground of failure to instruct on the authority issue, nor did it mention the issue in its own proposed jury instructions. It did not request that this issue be submitted to the jury in the special interrogatory verdict form which it proposed, nor did it request that the special verdict form which the trial court ultimately determined to give to the jury include this issue. Under such circumstances, the defendant has waived the issue. Fed.R.Civ.P. 49(a). For all of the above reasons, we find that this issue is not properly before this court.

### B. *Proof of the Contractual Modification*

■ Mass Mutual next contends that it is entitled to judgment on Litman's breach of contract claim because Litman did not prove a valid oral modification. As

grounds for this contention, the defendant argues that two written amendments to the contract vitiate the prior oral agreement. It also claims that Albro's promise can only be interpreted as a "friendly assurance" or as a "statement of opportunity." Finding the issue as to whether or not a valid oral modification took place to be a proper jury question, we find this argument to be an insufficient basis for reversal.

Mass Mutual's contention that a 1967 and a 1975 written amendment to the contract vitiate the oral agreement between Litman and Albro is without merit. The amendments have nothing whatsoever to do with the grounds required to support a valid termination; they rather merely change the payment schedule for commissions after termination. Nothing in the amendments is inconsistent with the prior oral modification, nor do they purport to modify its subject matter in any way. This contention falls far short of that required to properly keep the oral modification issue from the jury.

■ We likewise disagree with defendant's argument that Albro's promise was merely a "friendly assurance" or "statement of opportunity." At the minimum, in light of Litman's unequivocal testimony that Albro promised him that fraud or breach of fiduciary duty would be the sole cause for termination of his contract, the proper interpretation of Albro's statements was a factual issue for determination by the jury. It is clear that the evidence was conflicting as to many of the issues, including this one, surrounding the alleged oral modification. In such a situation, as the Supreme Court has stated,

> [c]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions, or because judges feel that other results are more reasonable. *Tennant v. Peoria & Pekin Union Railway*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944).

---

**5.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) *(en banc),* this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Spurlin v. General Motors Corp.*, 528 F.2d 612, 619–20 (5th Cir.1976). *Accord Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir.1969) *(en banc)*.

### C. *The Consideration Issue*

■ Mass Mutual next contends that it is entitled to judgment on Litman's breach of contract claim because no consideration was given for Albro's promise other than the services incident to the employment. We reject this contention, however, for it has long been held in Massachusetts that where a contract is substantially modified by agreement of the parties the additional obligation requires no new consideration, as the modified contract takes effect by way of substitution. *See Johnston v. Holiday Inns, Inc.*, 565 F.2d 790 (1st Cir.1977); *Stevens v. G.L. Ruyo & Sons*, 209 F.2d 135 (1st Cir.1953); *McFaden v. Nordblom*, 307 Mass. 574, 30 N.E.2d 852 (1941); *Zlotnick v. McNamara*, 301 Mass. 224, 16 N.E.2d 632 (1938); *Earnschaw v. Whittemore*, 194 Mass. 187, 80 N.E. 520 (1907). It is entirely reasonable that the jury could have found such a substantial modification to have been effectuated. It is also reasonably inferable from Litman's testimony that he would not have gone forward with his contract had he not received Albro's assurance that he would not be terminated except for fraud or breach of fiduciary duty. The jury could thus have found a refusal to perform by Litman and a modification of the contract in order to secure his performance on the part of Mass Mutual. In such a situation, Massachusetts' law dictates that the consideration for continuance or performance is sufficient. *See Stevens v. G.L. Ruyo & Sons, supra; Kuzmeskus v. Pickup Motor Co.*, 330 Mass. 490, 493, 115 N.E.2d 461, 463 (1953); *Kirkley v. F.H. Roberts Co.*, 268 Mass. 246, 252, 167 N.E. 289, 290 (1929); *National Electric Signaling Co. v. Fessenden*, 207 F. 915 (1st Cir.

1915); *Rice v. Dwight Manufacturing Co.*, 56 Mass. 80 (1848); *Munroe v. Perkins*, 26 Mass. 298 (1830).

### D. *The Parol Evidence Rule*

■ Mass Mutual next contends that it is entitled to judgment on Litman's breach of contract claim on the grounds that the parol evidence rule bars enforcement of the oral modification.[6] The defendant does not argue that the parol evidence rule bars proof of the oral modification, as the rule does not encompass oral modifications made subsequent to the execution of a written contract. Rather, it argues that the oral modification should not be enforced due to the existence of the written amendments to the agreement which failed to include the alleged oral modification. Mass Mutual relies upon several decisions for this broad proposition; however, in each decision, the "amendment" which was found to bar enforcement of a prior oral agreement was a fully integrated written contract covering every facet of the parties' relationship, and the integrated agreement contained a term clearly inconsistent with the prior oral agreement. *See Coiffure Continental v. Allert*, 518 S.W.2d 942 (Tex.1975); *Vulcan Materials v. Douglas*, 131 Ga.App. 21, 205 S.E.2d 84 (1974); *Matthew v. American Family Mutual Insurance Co.*, 54 Wis.2d 336, 195 N.W.2d 611 (1972). In those circumstances, a straightforward application of the rule results in non-enforcement of the prior oral agreement. By contrast, as mentioned above, none of the written amendments to Litman's contract contain any language purporting to modify the termination provision of the contract. None of the amendments, therefore, can be considered a fully integrated agreement sufficient to invoke the bar of the parol evidence rule.

---

**6.** Litman argues persuasively that because this contention was not raised in either of Mass Mutual's motions for a directed verdict, nor in its motion for judgment n.o.v., it has not been presented for review. Mass Mutual claims that because the parol evidence rule is substantive rather than procedural law in Massachusetts, *see Mears v. Smith*, 199 Mass. 319, 85 N.E. 165

(1908), the trial court's ruling adverse to Mass Mutual on this claim on summary judgment relieved the defendant from the obligation to later raise the issue. Because the parol evidence rule is clearly inapplicable to the facts at issue here, we need not decide whether the defendant waived the parol evidence objection under these facts.

### E. *Proof of Promissory Estoppel*

 Mass Mutual next contends that Litman did not establish at trial a prima facie case as to his alternative argument of "promissory estoppel." *See* Restatement (Second) of Contracts § 90.[7] We disagree, for there was extensive testimony before the jury that Litman's career as a general agent required a substantial investment in time, energy and money before its benefits would ever be reaped. Litman also testified that he relied on the understanding that his position was safe until retirement, unless he committed fraudulent acts, in borrowing large amounts of funds for operation of the agency. We find, therefore, that whether Litman's "reliance" on the oral promise was "reasonable" and whether an injustice could only be avoided by the imposition of appropriate damages, to be clear jury questions on these facts.

### F. *The Proof of Damages*

Mass Mutual next contends that it is entitled to judgment on both of Litman's contract claims on the basis that Litman presented no competent evidence of his damages. We find no merit to this contention.

 It is well established that future damages of the type awarded to Litman are recoverable in Florida if "the amount can be established with reasonable certainty ..." *Twyman v. Roell*, 123 Fla. 2, 166 So. 215, 217 (1936). The impossibility of calculation with "absolute exactness" will not defeat recovery. *McCall v. Sherbill*, 68 So.2d 362 (Fla.1953). Although future damage awards in the form of "lost profits" are often difficult to prove and inherently suspect, Florida has long allowed their recovery where an "established business" with a long track record has gone under due to a defendant's breach. The courts have reasoned that such a business record provides a solid foundation upon which future projections can reasonably be made. *See New Amsterdam Casualty Co. v. Utility Battery Manufacturing Co.*, 122 Fla. 718, 166 So. 856 (1935).[8]

 We find that the facts of this case support the jury's award of future damages. Litman's business was in existence for fifteen years; its regular growth and its profits and expenses were listed extensively in the record at trial. Furthermore, the projection of Litman's future profits, a projection upon which the award of future damages was based, was prepared by the *defendant's* in-house expert, Emmett Jergensen. This evidence in the record clearly establishes a sufficient basis for the jury's award of future damages.

### III. THE CLAIM OF ENTITLEMENT TO A NEW TRIAL ON THE BREACH OF CONTRACT ISSUE

 The defendant contends that he is entitled to a new trial because the trial court did not submit to the jury the first question on its proposed verdict form. The question read as follows:

> Do you find that the written General Agency Agreement entered into between Massachusetts Mutual Life Insurance Company and Bernard Litman was modified by the parties' subsequent course of conduct [or oral representations]?

Record Vol. 5 at 680. The district court rejected this question in favor of the following:

> Did Massachusetts Mutual Life Insurance Company wrongfully breach a modified contract existing between Bernard

---

7. The Restatement of Contracts § 90 provides:
 A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.
 Contrary to Mass Mutual's assertion, this theory of contractual recovery *is* recognized in Massachusetts. *See Loranger Construction Corp. v.*

*E.F. Hauserman Co.*, 6 Mass.App. 152, 374 N.E.2d 306, *aff'd*, 376 Mass. 757, 384 N.E.2d 176 (1978).

8. Although Florida law is, by the parties' consent, dispositive of the damages issues, we note that plaintiff's evidence in this case would likewise support a claim of future damages under Massachusetts law. *See Knightsbridge Marketing Services, Inc. v. Promociones Y Proyectos, S.A.*, 728 F.2d 572 (1st Cir.1984).

Litman and Massachusetts Mutual Life Insurance Company?

Record Vol. 4 at 610. Mass Mutual contends that the question actually submitted to the jury effectively directed a verdict on the issue of modification by concluding for the jury that the contract had already been modified. We disagree.

A trial court has considerable discretion in the manner in which special interrogatories are formulated; it may combine several elements of a single claim into a single question, as long as the question is fair and does not combine two issues disjunctively. *See* Wright and Miller §§ 2506, 2508; *Moore's Federal Practice* ¶ 49.03[2]. The question submitted to the jury in this case was in the conjunctive; it simply combined the issue of modification with the issue of breach, and the jury was required to find the existence of both elements of plaintiff's claim before it could rule in plaintiff's favor. We find that the question was not unfair to the defendant and that the trial court was well within its discretion in approving the question in the form in which it was given.[9]

## IV. THE SLANDER AWARD BASED UPON JAMES MARTIN'S STATEMENT TO JAMES FARNEY

Mass Mutual next contends that it is entitled to judgment on Litman's slander action for the statement of Martin because the statement was, as a matter of law, not actionable slander. The defendant presents several distinct arguments in support of this contention; however, we agree with defendant's claim that the statement is not a "publication" under Florida law and find this dispositive of the issue.

■ It is axiomatic that "invited defamation", or the issuance of a defamatory statement wherein the injured party precipitated the statement's release, is not action-

able. The Restatement of Torts 2d § 583 (1977) states this principle as follows:

> ... the consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation.

*Accord, Johnson v. City of Buckner,* 610 S.W.2d 406 (Mo.1980) (plaintiff requested explanation for termination in presence of third parties); *Duncatell v. Universal Life Insurance Co.,* 446 S.W.2d 934 (Tex.1969); *Pierce v. Northwestern Mutual Life Insurance Co.,* 444 F.Supp. 1098, 1101 (D.S. C.1978). Florida has approved this general rule but has couched it in terms of a lack of "publication," one of the elements necessary to establish a prima facie case of slander. *See Maine v. Allstate Insurance Co.,* 240 So.2d 857 (Fla.Dist.Ct.App.1970) ("[A] communication addressed to a third party, procured to be so addressed by the party libeled, does not amount to a publication."). *See also Smith v. Anheuser-Busch Brewing Co.,* 346 So.2d 125 (Fla. Dist.Ct.App.1977).

■ In this case, Litman knew, prior to authorizing Mr. Farney to call James Martin, that Mass Mutual's position was that Litman was in a financial mess at the time of his termination. The undisputed testimony was that Litman gave Mr. Farney "... a complete right to check on anything and everything [Litman] did in the past." Record Vol. 7 at 239. Farney testified that he was looking "for both good and bad information," and that he posed the question to James Martin, "... what was the problem as far as Mass was concerned?" Record Vol. 7 at 127, 130. It was only then that Martin alluded to the fact that Litman did not pay his business bills. Under these circumstances, we hold that Litman invited and consented to the publication of the alleged defamation to Mr. Farney. The statement is thus not actionable and we

---

**9.** Mass Mutual also contends that it is entitled to a new trial on the breach of contract claims because the trial court did not strike the testimony of one witness, Robert Oliver, concerning the company's policy of encouraging the termination of troublesome career agents. In light of our finding that the defendant's motivation for

terminating Litman was very much an issue at trial, both in regard to the breach of contract claims and to the slander claims (as to which defendant's prime defenses were truth and "good motives"), we hold that this claim is without merit.

reverse the district court's judgment with respect to this slander claim.

## V. THE SLANDER AWARD BASED UPON THE STATEMENTS OF De-VALLE AND GRIFFIN

### A. *Truth and Good Motives*

■ Mass Mutual next contends that it is entitled to judgment on Litman's slander action for the statements of DeValle and Griffin because the statements were true and made with good motives as a matter of law. We disagree. The record reflects much disagreement as to whether Litman was in fact a "bad businessman" and the evidence is also conflicting as to whether Litman was terminated because of any perceived financial problems, because of his refusal to cancel his appointment with other companies, or because of the general animosity existing between Litman and Mass Mutual's corporate officers. For these reasons, we find that the jury could have properly found that Litman was not a "bad businessman," as alleged by Griffin and DeValle, or that he was not terminated for that reason. A jury question was also presented on the issue of "good motives". We find from the evidence that the jury could have properly determined that the statements were not made for the benefit of Litman's agents, but rather to minimize the chances that they would follow Litman elsewhere.

### B. *Privilege*

■ Mass Mutual next claims that DeValle's and Griffin's statements were privileged as a matter of law. This contention is also erroneous. Florida law dictates that before a qualified privilege arises for a slanderous statement, it must be shown that the party making the defamatory statement had a duty or a right, in the interests of society, to make the statement. *See Abraham v. Baldwin,* 52 Fla. 151, 42 So. 591 (1906); *Lundquist v. Alewine,* 397 So.2d 1148 (Fla.Dist.Ct.App.1981). The jury found no such duty or right; to the contrary, the jury found that the statements were "made with willfulness and malice and reckless indifference to the plaintiff's rights." Record Vol. 10 at 937.

We find, for the reasons stated above, that there was sufficient evidence to support this finding.

### C. *Slander Per Se*

■ The defendant next contends that the trial court erred in holding that DeValle's and Griffin's statements were actionable *per se* and in instructing the jury to that effect. We find no such error. A slander which imputes to the plaintiff a matter which reflects adversely upon him in his occupation has long been held actionable *per se* in Florida. *See Teare v. Local Union No. 295 of the United Ass'n of Journeymen and Apprentices of Plumbers and Pipe Fitters Industry of U.S. and Canada,* 98 So.2d 79 (Fla.1957); *LeMoine v. Spicer,* 146 Fla. 758, 1 So.2d 730 (1941); *Commander v. Pedersen,* 116 Fla. 148, 156 So. 337 (1934). We find the comments that Litman was terminated because he was a "bad businessman" or "lousy businessman" to fall well within this category.

### D. *The Amount of the Damages*

■ The defendant contends that it is entitled to a new trial on the issue of the amount of compensatory damages awarded for the statements of DeValle and Griffin because the amount was unsupported by the evidence. We disagree, finding that the evidence can easily be interpreted to prove extensive damage to Litman's reputation resulting from these statements. Mass Mutual's own president, William Clark, testified that the insurance industry is a closed fraternity; that the treatment of general agents becomes known in the industry; and that he would expect the entire industry to know about the slanderous statements. Record Vol. 8 at 541-43. There was also evidence that the statements were widely disseminated and that Litman's reputation was severely tarnished. *See* Record Vol. 7 at 142, 325, 331-45, 365, 377-78, 401. Because the several elements of damages to which Litman is entitled are intangible, the amount of which rested largely in the jury's discre-

tion, we find no abuse of discretion in the trial court's acceptance of the verdict.

## VI. PUNITIVE DAMAGES

■■■ Mass Mutual finally contends that it is entitled to judgment on the issue of punitive damages. The company argues alternatively that the amount of punitive damages awarded is excessive and that it is entitled to a new trial on that ground. We find the jury's determination that the statements by DeValle and Griffin were made with a malicious purpose and with reckless indifference to the plaintiff's rights to adequately support the punitive damage award for those slanderous statements. However, in view of our reversal of the slander award based upon the statements of James Martin, we must remand the punitive damage issue to the district court for a new trial. This result is inavoidable in light of the fact that the jury's $250,000 punitive damage award was made in response to a single question on the special verdict form: "What amount of punitive damages do you assess against the defendant, Massachusetts Mutual Life Insurance Company for the slander?" Record Vol. 10 at 938. Although Florida has disavowed the rule that punitive damages must bear some relation to compensatory damages, *see Wackenhut Corp. v. Canty*, 359 So.2d 430 (Fla.1978), it must be remembered that punitive damages are awarded upon a theory of punishment, of penalty for outrageous conduct. *See Jones v. Greeley*, 25 Fla. 629, 6 So. 448 (1889). The Florida Supreme Court has further held that a new trial or a remittitur may be ordered if the manifest weight of the evidence demonstrates that the amount of punitive damages assessed was out of all reasonable proportion to the defendant's malice. *Arab Termite & Pest Control of Florida, Inc. v. Jenkins*, 409 So.2d 1039 (Fla.1982). Because we have held that the statements made by James Martin to Mr. Farney cannot be slanderous as a matter of law, we accordingly cannot approve a punitive damage award based partly on the perceived outrageousness of that statement.

## VII. CONCLUSION

We hold that the statement made by James Martin of Mass Mutual to Litman's prospective employer cannot as a matter of law be actionable as slander; we accordingly reverse the award of $100,000 based upon this statement. We likewise hold that the award of punitive damages must be reversed and the issue remanded for a new trial. As to all other claims, the judgment of the district court is affirmed.

AFFIRMED in part, REVERSED in part and REMANDED.