Cheryl S. **PEDEN,** Plaintiff,

v.

**SUWANNEE COUNTY SCHOOL BOARD** and Charles F. Blalock, Jr., individually and in his capacity as Superintendent, Suwannee County School Board, Defendants.

No. 92–120–Civ–J–20.

United States District Court, M.D. Florida, Jacksonville Division.

Nov. 18, 1993.

Archibald J. Thomas, III, Esq., Jacksonville, FL, for plaintiff.

George N. Meros, Jr., Tallahassee, FL, for defendants.

## OPINION and ORDER

SCHLESINGER, District Judge.

This is an action for alleged sexual harassment and wrongful termination from employment. Plaintiff was employed by the Suwannee County School Board from 1970 to March, 1990. Plaintiff contends that she was denied promotion to Director of Vocational Services ("Vocational Director") due to her sex and because she complained, prior to the employment decision, about the composition of the hiring committee. Plaintiff also alleges that her contract as Food Services Director was not renewed because of her sex and because she complained about not having earlier been hired as Vocational Director.

In February, 1992, Plaintiff filed this action, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and pursuant to the First and Fourteenth Amendments as secured by 42 U.S.C. § 1983, seeking reinstatement, back pay,

compensatory and punitive damages, and attorney's fees and costs. Defendants deny any wrongdoing, and assert that there were valid, non-discriminatory reasons for the adverse employment decisions.

This cause came to be tried between August 9 and August 14, 1993. The claims under section 1983 were tried before the jury, while the Title VII claims were tried before the Court. The jury, by special verdict (Doc. No. 108), decided: (1) that Plaintiff's sex was not a substantial or motivating factor in Defendant's decision not to hire her for the position of Vocational Director, and that Defendants would have made the same decision even if Plaintiff were not a woman; (2) that Plaintiff's exercise of her free speech rights was a substantial or motivating factor in Defendant's decision not to hire her for the position of Vocational Director, but that Defendants would have made the same decision whether or not Plaintiff had exercised her right to free speech; and (3) that Plaintiff's exercise of her free speech rights was a substantial or motivating factor in Defendant's decision not to renew her annual contract as Food Services Director, but that Defendants would have made the same decision whether or not Plaintiff had exercised her right to free speech.

■ The Court heard identical evidence on the Title VII claims as the jury heard on the section 1983 claims. Nevertheless, these are distinct causes of action, and the jury's findings as to the section 1983 claims are not binding on the Court with respect to its findings made herein as to the Title VII claims. See Sherman v. Burke Contracting, Inc., 891 F.2d 1527, 1529 n. 4 (11th Cir.), cert. denied, 498 U.S. 943, 111 S.Ct. 353, 112 L.Ed.2d 317 (1990).[1]

## FINDINGS OF FACT

At the times relevant to this lawsuit, the members of Defendant Suwannee County

---

1. Defendants shared this position prior to the trial, see Defendants' Amended Proposed Findings of Fact and Conclusions of Law (Doc. No. 81) at 15. However, after a favorable jury verdict was returned on the section 1983 claims, Defendants instead contended—not surprising-

ly—that the verdict was binding on the Court. See Memorandum in Support of Jury's Defense Verdict on Section 1983 Claims and Defense Verdict on Title VII Claims (Doc. No. 111) at 3–4.

School Board ("the School Board" or "the Board") were Sam Barnett, Eloise Boyles, J.M. Holtzclaw, William Howard and Jessie Philpot, and the Superintendent of Schools was Defendant Charles F. Blalock, Jr. ("Blalock"). Plaintiff was employed by the School Board in 1970, teaching for approximately ten years at the middle and secondary school levels.

In 1982 Plaintiff applied for and was hired as Suwannee County Food Services Director. At that time Plaintiff did not have any supervisory or administrative experience, nor had she received her Masters Degree, which she ultimately obtained in 1985.

Marvin Johns and O.P. Warren were members of the interview committee in 1982 when Plaintiff was selected for the Food Services position. Johns and Warren also were members of the committee at the time the new Vocational Education Director's was chosen.

Plaintiff received generally positive evaluations while she served as Food Services Director. However, her least favorable evaluations were recorded for her dealings with food service personnel.

Defendant Blalock was elected Superintendent of Schools for Suwannee County in November, 1988, having served previously as principal of Suwannee Elementary East. While principal at that school, Blalock became aware that the Food Services workers there disliked Plaintiff. Thus, prior to becoming Superintendent, Blalock was aware of complaints about Plaintiff's abrasive managerial style and her negative attitude towards her employees. When he became Superintendent, Blalock received complaints about Plaintiff from several Food Services workers. Blalock received these complaints both before and during the pendency of Plaintiff's application for the position of Vocational Education Director.

Soon after becoming Superintendent, Blalock met with Plaintiff to discuss some of these complaints. From the responses she gave to his inquiries, Blalock ascertained that Plaintiff did not think highly of these unskilled cafeteria workers, and that she treated them with arrogance and disdain.

Under Florida law, Defendant Blalock was required to submit his personnel recommendations to the School Board not later than eight weeks prior to the end of the post-school conference period. This usually required Blalock to make recommendations for renewal or initial annual contracts for all positions other than those filled by continuing contract personnel.

Although aware of the complaints concerning Plaintiff's performance as Food Services Director, in March, 1989, Blalock recommended that her annual contract be renewed, in part because he believed she should be allowed the opportunity to improve her working relationship with her subordinates.

In 1989, Defendant School Board advertised for the position of Vocational Education Director. Plaintiff was one of five applicants for the position.

Under the Board's rules and procedures, the hiring committee appointed for the selection of any position would individually review the applications, convene in a regular meeting to conduct the interviews, and subsequently announce its first and second choices for the position. The committee would entertain discussion concerning the recommendations to be made to the Superintendent. However, the hiring committee made *recommendations* only; the Superintendent had the full authority to accept or reject the recommendation, to advertise again, or to choose other individuals to recommend to the Board. It would then be the Board's decision whether to accept or reject the Superintendent's recommendation.

As chosen by O.P. Warren, Assistant Superintendent for Personnel, the committee appointed for the selection of the position of Vocational Education Director consisted of: Marvin Johns, another Assistant Superintendent; Dennis Resor and Wyman Clark, community members also involved as committee members in the vocational technical and high schools; and Vincent Jones, the retiring Vocational Education Director.

Plaintiff testified that prior to the committee's deliberations she complained to Johns and Warren about the all-male composition of the committee. Johns, however, denied

that Peden ever made any such complaints to him. Blalock similarly denied that Plaintiff ever conveyed these alleged complaints to him (Blalock). The Court finds the credible evidence in this regard to be against Plaintiff: it appears that neither Blalock nor *any other member of the School Board* were ever aware of any complaints she might have made about the composition of the committee.

Furthermore, concerning Vincent Jones, another member of the committee, Plaintiff testified that Jones offered her a position as his secretary. Jones, however, denied that he ever made Plaintiff such an offer, and the Court believes Jones, despite Plaintiff's assertions to the contrary. Nevertheless, the Court concurs with Defendants that this issue may be irrelevant, since even if Jones *did* make such an offer to Plaintiff, there is no evidence in the record or any of the live testimony that this offer was known to Defendants, who, were the decision-makers— the actual "employers" within the meaning of Title VII—in this matter.

During the interviews, the committee asked Plaintiff a number of specific questions that dealt with vocational education. Plaintiff either was unwilling or unable to answer many of these questions, stating to the committee that her experiences had been in general administration, not vocational education. Plaintiff also was unable to sufficiently assure the committee that she would do whatever might be necessary to timely complete the required course work for her certification.

As to the proposed combination of the positions of Vocational Education Director and Principal of the Vocational School, Plaintiff gave evasive answers, and gave at least one committee member the impression that she did not favor this proposal. Plaintiff gave the impression to one member of the committee that she really was not interested in doing the job as the administration proposed it to be, but rather wanted to design the job the way *she* thought it should be.

Conversely, Walter Boatright, who ultimately was hired for the Vocational Education Director position, created a highly favorable impression before the committee.

Boatright adequately assured the committee that he would be able to obtain his Masters Degree and certification for this position within the requisite time period, and was willing to be flexible to the proposal to merge the Director and Principal's positions. Boatright convinced the committee that Vocational Education Director was a position he wanted, and one towards which he had worked nearly his entire professional career.

After the interviews were completed, the committee discussed the strengths of the respective applicants. Johns expressed concern about Plaintiff's ability and/or willingness to timely complete her certification requirements, and her apparent reluctance to discuss the proposed positions merger. Sarah Severance, who was the committee's second choice for the position (after Boatright), already had served in several leadership positions at the Vocational Technical School, and had evinced an ability to work ably with the community and to write well.

Boatright, however, was the unanimous recommendation of the committee, having impressed each of the committee members that he was straightforward with his answers and with his willingness to fully address any concerns the committee had raised. Plaintiff was not even *any* committee member's second choice for the position.

Warren conveyed the committee's recommendation to Blalock, who had interviewed each applicant after their interview with the committee. Blalock, who had known Boatright for some time, immediately agreed with the committee's recommendation. The Court finds that Blalock had never been told by Warren of any alleged concern Warren may have had concerning Plaintiff, a female, locking up at night. Blalock recommended Boatright for the position at the School Board's next regularly-scheduled meeting. The Board unanimously approved Blalock's recommendation.

The Court specifically finds that neither Blalock nor the School Board took gender into consideration in accepting the committee's recommendation of Boatright.

After the committee had made its recommendation to Blalock, he called Plaintiff to

his office to personally inform her that she had not been recommended. This meeting occurred on January 10, 1990. As she herself admitted during cross-examination, Plaintiff reacted to Blalock's announcement by stating something like, "Holy shit, you must be kidding," and then "thank you," leaving the office promptly, but also slamming the door in Blalock's face.

One particular incident (of which Blalock and the committee were aware) occurring during Plaintiff's tenure as Food Services Director concerned a December 23, 1989 storm. Many travelers were stranded in the Suwannee County area, and ultimately were temporarily housed in the Suwannee County Schools. At that time, Warren was unable to reach either Plaintiff or Defendant Blalock, but did contact Hettie Green, Food Services Manager for one of the schools. Green prepared meals for the stranded motorists at one of the school cafeterias, but was forced to use several cases of USDA commodity foods.

When Plaintiff returned from the holiday break, she was displeased upon discovering that this food had been used without prior approval from the USDA. As Plaintiff testified, she wrote a letter to Green reprimanding her for using the foods. Plaintiff also threatened to fire Green. Plaintiff informed Warren that she had reprimanded Green; however, Warren told Plaintiff that Green instead should have been commended for her actions, not admonished. Similarly, Blalock, who had received many phone calls in support of Green, and believed that Plaintiff's reprimand of Green was inappropriate.

Plaintiff also contacted Foylen Bryant at the USDA's Jacksonville, Florida, office to report the unauthorized use of the foods, and to ascertain how to correct this situation. Significantly, Plaintiff contacted the USDA without consulting Warren (her immediate supervisor) or Blalock. This gave Blalock the impression that Plaintiff was not a team player, and that by this action she was willing, if not eager, to undercut the chain of authority.

Plaintiff's annual contract as Food Services Director came up to be renewed in March, 1990. Florida law confers a school superintendent with the discretion not to renew an annual contract for any lawful reason. Plaintiff, therefore, had no protected contract or property right in the renewal of this contract. On March 12, 1990, Blalock informed Plaintiff by letter that he would not be recommending the renewal of her contract. From January, 1990—when Plaintiff was not selected to be Vocational Education Director—to March 12, 1990, Blalock had no idea that Plaintiff was contemplating any legal action concerning her failure to get the Vocational position, nor did Blalock know that Plaintiff believed that gender was the reason she was not selected.

Approximately two to three weeks later, Plaintiff telephoned Defendant Blalock, who agreed to meet with her in his office. Immediately, Plaintiff attacked Boatright's character and questioned the committee's wisdom in recommending him for the Vocational Education Director position. According to Blalock, whom the Court believes, Plaintiff was neither conciliatory or apologetic.

The Court concludes that Plaintiff ultimately left her teaching job because her husband got a high paying job in Washington, D.C., and Plaintiff wanted to remain with her husband. The Court finds not only that Plaintiff's testimony was highly inconsistent with that of other witnesses, but also that her own statements indicate an unbelievable credibility problem. For example, Plaintiff testified that for months in Washington she was unable to sleep at night. Yet Plaintiff sought no help for this other than through a minister. The Court cannot believe that this happened, given her education, or, if it did happen, that she did not seek professional help. Essentially, Plaintiff's testimony, contradicted by other witnesses, manifested to the Court distorted thought patterns.

## CONCLUSIONS OF LAW

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part:

It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ... 42 U.S.C. § 2000e–2(a).

In a Title VII employment discrimination case, the plaintiff must first make out a prima facie case. This initial burden, which is "not onerous," *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981), is discharged by showing that (1) she is a member of a protected group; (2) she is qualified for the position in question; (3) she suffered an adverse employment decision; and (4) a person outside the protected class was awarded the position in question. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Jones v. Firestone Tire and Rubber Co., Inc.,* 977 F.2d 527, 537–38 (11th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2932, 124 L.Ed.2d 682 (1993). Then, when the defendant produces a legitimate, nondiscriminatory reason for the adverse employment decision, the burden of production shifts back to the plaintiff to establish that this reason is pretextual. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

Although this allocation of burdens and creation of a presumption by the establishment of a prima facie case "is intended progressively to sharpen the inquiry into the elusive question of intentional discrimination," *id.* at 255 n. 8, 101 S.Ct. at 1094 n. 8, it must be stated emphatically that the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated "remains at all times with the plaintiff." *Id.* at 253, 101 S.Ct. at 1093; *Equal Employment Opportunity Commission v. Reichhold Chemicals, Inc.,* 988 F.2d 1564, 1570 (11th Cir.1993). This point recently was reiterated by the Supreme Court in *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), where the Court stated that even if the factfinder disbelieves a defendant's proffered reasons, this will only *permit* it to *infer* the ultimate fact of intentional discrimination. *Id.* —— U.S. at ——, 113 S.Ct. at 2749. "Nothing in the law," however, permits the substitution of the required finding that the defendant's action was the product of illegal discrimination with "the much different (and much lesser) finding that the employer's explanation of its action was not believable." *Id.* —— U.S. at ——, 113 S.Ct. at 2751.

Thus, notwithstanding the establishment of "certain modes and orders of proof," *id.,* the ultimate burden of persuasion remains with the plaintiff.

In a Title VII lawsuit, a defendant need not establish that the individual hired or promoted instead of the plaintiff was more qualified than the plaintiff. *Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096. Instead, "the employer has the discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Id.* at 259, 101 S.Ct. at 1097. Nevertheless, Title VII "does not demand that an employer give preferential treatment to ... women." *Burdine,* 450 U.S. at 259, 101 S.Ct. at 1096.

Importantly, Title VII does not vest federal courts with the power to sit as review boards for *every* personnel decision. The Act *does* provide a remedy for employment *discrimination*—and the Court will entertain such complaints with its full attention—but Title VII does not even require the employer to have good cause for its decisions. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir.1984). Rather, as the court of appeals has stated, "[t]he employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Id.* at 1187 (citing *Megill v. Board of Regents,* 541 F.2d 1073, 1077 (5th Cir. 1976)).

The Court finds that Plaintiff failed to make out a prima facie case that she was not promoted to Vocational Educational Director due to her sex, because Plaintiff did not establish by a preponderance of the evidence that she was qualified for this position. The testimony received by the Court indicated that the hiring committee needed assurances from the respective applicants that they could attain their vocational education certification by August, 1990. Plaintiff was unable

to satisfactorily assure the committee that she could do this in a timely fashion. Thus, at the time the decision was made, Plaintiff neither was qualified for the position she sought nor could she provide assurances to the committee that she could or would be qualified within the necessary timeframe.

■ Even assuming, arguendo, that Plaintiff had established a prima facie case, the Court finds that Defendants produced legitimate, non-discriminatory reasons for the recommending Boatright rather than Plaintiff for the position. Besides Boatright's strong connections to the Suwannee County community, the committee was impressed by his candor during the interview, which, as stated above, included his willingness to consider the possibility of merging the position of Vocational Education Director and Principal of the Vocational School. Boatright also sufficiently convinced the committee that he would obtain certification for the position within the permissible timeframe.

Boatright's overall application evinced a profound lack of "negative" material. On the other hand, Blalock was aware of the numerous complaints against Plaintiff by her subordinates in the Food Services Division, most dealing with her abrasive managerial style and her negative attitude towards her employees. In light of those complaints, and the incident involving the USDA food during the winter storm, it was reasonable for Blalock to conclude that Plaintiff did not have a sufficiently appropriate disposition for the promotion she sought.

Plaintiff failed to prove by a preponderance of the evidence that Defendants' articulated reasons for selecting Boatright were pretextual. Even if the Court were to find these reasons "not believable," *Hicks*, —— U.S. at ——, 113 S.Ct. at 2751—and the Court does not so hold—Plaintiff still was required to prove that Defendants' actions were "the product of illegal discrimination." *Id.* Plaintiff thus failed to prove by a preponderance of the evidence that she did not get the Vocational Education Director position because she is a woman.

Plaintiff also alleges that she was not promoted to this position because of comments she made about the all-male composition of the hiring committee. As stated above, the evidence fails to establish that any such complaints ever were made to Blalock or the School Board, or that either Defendant was aware of any such complaints. The preponderance of the evidence does not establish that these alleged complaints were the reason why Plaintiff was not chosen for this job.

■ Plaintiff also claims that she her contract as Food Services Director was not renewed because she is a woman. Regardless of why Blalock decided not to renew her contract, Plaintiff's claim is meritless because the evidence established that Plaintiff was replaced as Food Services Director by Ruth Warren, another female. Since Plaintiff was not replaced by a individual outside her protected, female class, she thus has failed to establish a prima facie case of sex discrimination.

Plaintiff also has failed to prove by a preponderance of the evidence that she was not renewed as Food Services Director because she was pursuing legal remedies for not being promoted to the Vocational position. The evidence failed to demonstrate that Defendants were aware of any such legal activity or any intent by Plaintiff to pursue such remedies. Moreover, Plaintiff did not actually file her EEOC complaint until June, 1990, and the contract renewal decision was made in *March* of that year.

## PLAINTIFF'S MOTION FOR A NEW TRIAL

After the trial, Plaintiff filed a Motion for Entry of Judgment in Favor of Plaintiff or in the Alternative for a New Trial (Doc. No. 112, filed September 2, 1993).

■ Plaintiff in part argues that the verdict form was misleading to the jury in that "the jury was not permitted to find liability only with respect to Mr. Blalock as opposed to the School Board in sections I, II or III of the verdict form." Motion at 2. However, objections to jury instructions or a verdict form are not preserved for appeal unless previously made at trial, *Carswell v. Bay County*, 854 F.2d 454, 458 (11th Cir. 1988); *Litman v. Massachusetts Mut. Life*

*Ins. Co.*, 739 F.2d 1549, 1557 (11th Cir.1984), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 652 (1988), and the Court construes this same requirement to apply to objections made in a Motion for a New Trial.

The Court finds that Plaintiff's argument in this regard is untimely. Aside from the trial being the most appropriate and practical place to consider objections to—and other options for—the verdict form, Plaintiff simply did not raise this objection at the trial, and thus was and is barred from raising this objection now or in any subsequent appeal. In any event, the Court concurs with Defendants that Plaintiff's contention that the verdict form did not properly "separate" the Defendants for the purpose of determining liability is highly inconsistent with her position throughout the trial that the actions of Blalock essentially bound the School Board.

Plaintiff also asserts that the Court should give effect to the jury's award of $30,000 punitive damages, even though the jury did not award any compensatory damages.

In a section 1983 action, punitive damages are available only when a defendant's conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); *see Anderson v. City of Atlanta*, 778 F.2d 678, 688 (11th Cir.1985). This type of damages is distinguishable from compensatory damages, in that the purpose of imposing punitive damages is not to compensate, but to punish. As the Supreme Court has stated:

> Punitive damages by definition are not intended to compensate the injured party, but rather to punish the *tortfeasor* whose *wrongful* action was intentional or malicious, and to deter him and others from similar extreme conduct.

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 266–67, 101 S.Ct. 2748, 2759, 69 L.Ed.2d 616 (1981) (emphasis supplied). While punishment is not "as prominent a purpose under [section 1983] as are compensation and deterrence," punitive damages nonetheless may be awarded in appropriate circumstances "in order to punish *violations of constitutional rights.*" *Id.* at 268, 101 S.Ct. at 2760 (emphasis supplied).

"No matter how egregious the conduct," *Wright v. Sheppard*, 919 F.2d 665, 671 (11th Cir.1990), whether to award punitive damages is left to the factfinder. As to assessing the amount of punitive damages, a jury is accorded broad discretion. *See, e.g., City of Newport*, 453 U.S. at 270, 101 S.Ct. at 2761; *Electrical Workers v. Foust*, 442 U.S. 42, 50–51, 99 S.Ct. 2121, 2126–27, 60 L.Ed.2d 698 (1979). What must be noted as to this latter point is that the jury's discretion is only as to the *amount;* when a jury finds that no constitutional violation has occurred, it may not reward a plaintiff with punitive damages.

This distinction must be made in light of Eleventh Circuit precedent allowing for the award of punitive damages in a 1983 action "even without actual loss." *See Davis v. Locke*, 936 F.2d 1208, 1214 (11th Cir.1991) (citing *Wilson v. Taylor*, 658 F.2d 1021, 1033 (5th Cir.Unit B 1981)); *Glover v. Alabama Dept. of Corrections*, 734 F.2d 691, 694 (11th Cir.1984), *cert. granted and vacated*, 474 U.S. 806, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985), *on remand*, 776 F.2d 964 (11th Cir.1985) (affirming jury award of $25,000 punitive damages award in section 1983 case even though only $1 in nominal damages awarded).

Although the proposition for which these cases stand sounds extraordinary, it is clear, upon closer inspection, that they are easily distinguishable from cases such as that of the instant Plaintiff. In *Davis*, the jury found that defendants *"violated Davis's constitutional rights* by causing him to fall from the back of the truck." 936 F.2d at 1211 (emphasis supplied). That the jury found that the plaintiff suffered no compensable damages did not bar a proper imposition of $1,750 in punitive damages, the evidence there supporting a conclusion that the defendants "acted with reckless or callous indifference to Davis' constitutional rights." *Id.* at 1214.

Similarly, in *Glover*, a directed verdict was returned for all the defendants except one,

against whom $1 in compensatory damages was awarded. The jury also awarded $25,-000 against that defendant. The court of appeals upheld the jury's respective awards, holding that "punitive damages can be awarded under § 1983 even when a plaintiff suffers no compensatory damages." 734 F.2d at 694. The court found that the evidence was sufficient to warrant the inference that this defendant's acts was the proximate cause of an attack on the plaintiff, but that plaintiff simply had given the jury no guidance as to a "dollar and cents amount" representing his suffering. *Id.* The punitives award, however, reflected the jury's finding that the defendant acted "wantonly, wilfully, or in reckless disregard of plaintiff's rights," and it could not be said that the punitives award was "unconscionable or the product of jury bias or prejudice." *Id.*

The real proposition for which the above cited cases stand could be summarized as follows: in a section 1983 action, a jury may properly awarded punitive damages even though it awards no compensatory damages, but *only* where the jury first finds that *a constitutional violation was committed by the party against whom the punitives are imposed.* A jury, in *any* case, might find that a defendant has violated a plaintiff's rights or breached a duty owed to that plaintiff. Nevertheless, the plaintiff may be unable to establish the existence of compensatory damages, or what might be called "nominal" damages. That inability does not negate the jury's finding of a *violation;* it simply means that the plaintiff cannot prove compensable harm *caused* by this violation.

In the instant case, the jury did not reach the question of compensatory damages, because it was instructed not to do so if it found that Plaintiff had not established necessary elements of her claims to entitle the jury to impose any type of liability. The jury simply did not reach the issue of whether Plaintiff had suffered any type of damages, whether compensatory or punitive. Thus, its subsequent award of $30,000 in punitive damages, in the absence of any finding of Plaintiff's constitutional rights being violated, is mere surplusage to which this Court will give no effect.

The Court instructed the jury as follows: If you find for the Plaintiff and against the Defendants on their defense, you must then decide the issue of the Plaintiff's damages. If, on the other hand, you find that the Plaintiff has failed to prove her claims, your verdict should be for the Defendants. Court's Instructions to the Jury (Doc. No. 110) at 8. The Court also described the criteria for which punitive damages could be awarded "*in addition to* compensatory damages." *Id.* at 10.

Thus, if the jury concluded that Plaintiff had not proved her claims, the jury was not to consider the issue of damages, either compensatory or punitive, and this instruction was reflected, in large measure, in the verdict form. As to each charge, the verdict form instructed the jury to bypass the respective compensatory damages interrogatories if the jury concluded that Plaintiff had not proved a necessary element of her case. For example, as to the charge of sex discrimination in Plaintiff's failure to be promoted to Vocational Education Director, the jury found that sex was not a substantial or motivating factor in this decision, and that Defendants would have made the same decision even if Plaintiff were not a woman. As to this latter finding, the verdict form instructed the jury to bypass the damages questions if it answered the "would have made the same decision" question in the affirmative. Similarly, as to each of the last two charges, namely, that the Vocational and Food Services employment decisions were made in retaliation for Plaintiff's exercise of free speech rights, the jury found that Defendants would have made the same decision whether or not Plaintiff had exercised her right to free speech. Again, if the jury answered those questions affirmatively, the verdict form instructed the jury to bypass the respective damages questions.

Thus, the jury did not answer the compensatory damages questions because it was instructed not to do so if essential elements of Plaintiff's claims were not established. Implicitly, then, *the jury found no injury.* Plaintiff was entitled to punitive damages

*only* as a supplement to compensatory damages, according to the Court's instructions, and not in the alternative if the jury found no liability.

 Inconsistent or ambiguous verdicts must be reconciled only if this can be accomplished "from a *fair* reading of the verdict." *Burger King Corp. v. Mason,* 710 F.2d 1480, 1489 (11th Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984). However, "if there is a view of the case which makes the jury's answers consistent," then the Court must adopt that view. *Aquachem Co., Inc. v. Olin Corp.,* 699 F.2d 516, 521 (11th Cir.1983).

In the instant case, the Court concludes that the answers in the verdict form are *not inconsistent;* rather, the jury's award of $30,000.00 simply is a nullity, since the jury found no liability. Moreover, the Court rejects Plaintiff's argument that the punitive damages award represented a finding of liability on the part of Defendant Blalock. The jury specifically found as to each charge that Plaintiff had not proved essential elements of her claim, and thus was entitled to no compensatory damages. The jury's subsequent decision to award punitive damages was "by definition irrelevant in these circumstances, and cannot be used to impeach the jury's clear verdict." *White v. Grinfas,* 809 F.2d 1157, 1161 (5th Cir.1987).

## CONCLUSION

For the reasons expressed above, Plaintiff's Motion for Entry of Judgment in Favor of Plaintiff or in the Alternative for a New Trial (Doc. No. 112) is **DENIED**. Plaintiff's claims filed pursuant to Title VII hereby are **DISMISSED WITH PREJUDICE**.

The Clerk is directed to (1) enter judgment in favor of Defendants in accordance with this Opinion and Order with regard to all of Plaintiff's claims; (2) assess costs according to law; and (3) close the file.

DONE AND ORDERED.