Paula Corbin JONES, Plaintiff,

v.

William Jefferson CLINTON and Danny Ferguson, Defendants.

No. LR–C–94–290.

United States District Court,
E.D. Arkansas,
Western Division.

Aug. 22, 1997.

Daniel M. Traylor, Little Rock, AR, Joseph Cammarata, Washington, DC, Gilbert K. Davis, Fairfax, VA, for Paula Corbin Jones.

Kathlyn Graves, Wright, Lindsey & Jennings, Little Rock, AR, Stephen C. Engstrom, Wilson; Engstrom, Corum & Coulter, Little Rock, AR, Robert S. Bennett, Skadden, Arps, Slate, Meaghen & Flom, Washington, DC, for William Jefferson Clinton.

Bill W. Bristow, Seay & Bristow, Jonesboro, AR, Robert Batton, Municipal Judge, Jacksonville, AR, for Danny Ferguson.

Scott R. McIntosh, U.S. Dept. of Justice, Civil Division, Washington, DC, Douglas N. Letter, U.S. Dept. of Justice, Criminal Division, Washington, DC, for U.S. Dept. of Justice amicus.

## MEMORANDUM OPINION AND ORDER

SUSAN WEBBER WRIGHT, District Judge.

Paula Corbin Jones seeks civil damages from William Jefferson Clinton, President of the United States, and Danny Ferguson, a former Arkansas State Police officer, for alleged actions beginning with an incident in a hotel in Little Rock, Arkansas. This case was previously before the Supreme Court of the United States to resolve the issue of Presidential immunity but has since been remanded to this Court following the Supreme Court's determination that there is no constitutional impediment to allowing plaintiff's case to proceed while the President is in office. *See Clinton v. Jones,* —— U.S. ——, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997).[1] The matter is now before the Court on motion of the President for judgment on the pleadings and dismissal of the complaint pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. The plaintiff has responded in oppo-

1. Plaintiff's complaint was filed on May 6, 1994. On August 10, 1994, the President filed a motion to dismiss the complaint without prejudice on grounds of immunity and to toll any statutes of limitations until he is no longer President, thereby allowing the plaintiff to refile her suit after President Clinton is out of office. On December 28, 1994, this Court denied the President's motion to dismiss on immunity grounds and ruled that discovery in the case could proceed, but concluded that any trial should be stayed until such time as the President is no longer in office. *See Jones v. Clinton,* 869 F.Supp. 690 (E.D.Ark. 1994). Both parties appealed. On January 9,1996, a divided panel of the Court of Appeals

for the Eighth Circuit affirmed this Court's decision denying the President's motion to dismiss on immunity grounds and allowing discovery to proceed, but reversed this Court's Order staying the trial of this matter for the duration of President Clinton's term in office. *See Jones v. Clinton,* 72 F.3d 1354 (8th Cir.1996). The President thereupon filed a petition for certiorari with the Supreme Court, which was granted, *see Clinton v. Jones,* —— U.S. ——, 116 S.Ct. 2545, 135 L.Ed.2d 1066 (1996), and on May 27, 1997, the Supreme Court handed down its opinion affirming the decision of the Court of Appeals and allowing this case to proceed.

sition to the President's motion, and the President has filed a reply to plaintiff's response. For the reasons that follow, the Court finds that the President's motion for judgment on the pleadings and dismissal of the complaint should be and hereby is granted in part and denied in part.[2]

## I.

This lawsuit is based on an incident that is said to have taken place on the afternoon of May 8, 1991, in a suite at the Excelsior Hotel in Little Rock, Arkansas. President Clinton was Governor of the State of Arkansas at the time and the plaintiff was a state employee with the Arkansas Industrial Development Commission ("AIDC"). Ferguson was an Arkansas State Police officer assigned to the Governor's security detail.

According to the complaint, then-Governor Clinton was at the Excelsior Hotel on the day in question delivering a speech at an official conference being sponsored by the AIDC. Compl. ¶ 7. Plaintiff states that she and another AIDC employee, Pamela Blackard, were working at a registration desk for the AIDC when a man approached the registration desk and informed her and Blackard that he was Trooper Danny Ferguson, the Governor's bodyguard. Compl. ¶¶ 8–9. She states that Ferguson made small talk with her and Blackard and then left, but that he later reappeared at the registration desk, delivered a piece of paper to her with a four digit number written on it, and said that the Governor would like to meet with her in this suite number. Compl. ¶¶ 9–10. Thinking that it was an honor to be asked to meet the Governor and that it might lead to an enhanced employment opportunity, plaintiff states that she agreed to the meeting and that Ferguson escorted her to the floor of the hotel upon which the Governor's suite was located. Compl. ¶¶ 11–13.

Plaintiff states that upon arriving at the suite and announcing herself, the Governor shook her hand, invited her in, and closed the door. Compl. ¶¶ 13–14, 16. She states that the suite was furnished not for overnight hotel guests but as a business suite, containing a couch and chairs, but no bed. Compl. ¶ 15. In any case, plaintiff states that a few minutes of small talk ensued, which included the Governor asking plaintiff about her job and him mentioning that Dave Harrington, plaintiff's ultimate superior within the AIDC and a Clinton appointee, was his "good friend." Compl. ¶ 17. She states that the Governor then took her hand and "pulled her toward him, so that their bodies were in close proximity." Compl. ¶ 18. Plaintiff states she removed her hand from his and retreated several feet, but that the Governor approached her again and, while saying, "I love the way your hair flows down your back" and "I love your curves," put his hand on her leg, started sliding it toward the hem of her culottes, and bent down to attempt to kiss her on the neck. Compl. ¶¶ 19–20. She states that she walked away from the Governor and attempted to distract him by chatting about his wife, but that the Governor, after asking her if she was married, approached the sofa where she had taken a seat and, as he sat down, "lowered his trousers and underwear exposing his erect penis and asked [her] to 'kiss it.'" Compl. ¶ 21. Plaintiff states that she "became horrified" and stated to the Governor that she was "not that kind of girl" and that she had to leave as she would get in trouble for being away from the registration desk. Compl. ¶ 23. She states that the Governor, "while fondling his penis," said, "Well, I don't want to make you do anything you don't want to do," and then pulled up his pants and said, "If you get in trouble for leaving work, have Dave call me immediately and I'll take care of it." Compl. ¶ 24. Plaintiff states that as she left the room, the Governor "looked sternly" at her and said, "You are smart. Let's keep this between ourselves." Compl. ¶ 24.

**2.** Also before the Court is a motion by Ferguson to adopt the President's pleadings and grant dismissal in his favor on any count or allegation that is also applicable to his situation. The Court grants Ferguson's motion to adopt the President's pleadings although, as will be seen, that portion of the President's motion for judgment on the pleadings that the Court today grants is not applicable to Ferguson. The Court notes also that plaintiff's defamation claim against Ferguson is based on different allegations from those against the President and is not subject to any motion.

Plaintiff states that she would occasionally encounter Ferguson in the course of her employment with the AIDC following the alleged incident at the hotel. Compl. ¶¶ 35–37. She states that on one such occasion, Ferguson told her Mrs. Clinton was out of town often and that the Governor wants her phone number and wants to see her, and that on another occasion, Ferguson approached her and asked her how her fiancé, Steve, was doing, even though she had never told Ferguson or the Governor his name. Compl. ¶¶ 35–36. Plaintiff states that she again encountered Ferguson following her marriage and the birth of her child and that he said he had "told Bill how good looking you are since you've had the baby." Compl. ¶ 37. She also states that she was "accosted" by the Governor in the Rotunda of the Arkansas State Capitol when he "draped his arm over [her], pulled her close and tightly to his body," and said to his bodyguard, Arkansas State Police officer Larry Patterson, "Don't we make a beautiful couple—beauty and the beast?" Compl. ¶ 38.

Plaintiff continued to work at the AIDC following these alleged incidents but states that her enjoyment of her work was "severely diminished." Compl. ¶ 39. She states she was treated in a "hostile and rude manner" by certain superiors in the AIDC and that this rude conduct had not happened prior to her encounter with the Governor. Compl. ¶ 39. Plaintiff states that she was later transferred to a position that had no responsible duties for which she could be adequately evaluated to earn advancement and that the reason given to her by her superiors for this transfer—that her previous position had been abolished—was untrue and was a pretext for the real reason which was that she was being punished for her rejection of the Governor's various advances. Compl. ¶ 39. Plaintiff goes on to state that the job in which she was placed called for a higher grade and pay, but that she was not paid more money than she received in her previous position and never received a raise beyond a cost of living increase, even though other employees received merit increases. Compl. ¶ 39.

Plaintiff voluntarily terminated her employment with the AIDC on February 20, 1993, and moved to California with her husband and child shortly thereafter. Compl. ¶ 40. She states that in January 1994, while visiting family and friends in Arkansas, she was informed of a magazine article in *The American Spectator* regarding her alleged encounter with the Governor at the Excelsior Hotel. Compl. ¶ 41. Plaintiff states that this article, which she claims was based in part on an interview with Ferguson, falsely asserts that "a woman by the name of 'Paula' told an unnamed trooper (obviously Defendant Ferguson), who had escorted 'Paula' to Clinton's hotel room, that 'she was available to be Clinton's regular girlfriend if he so desired,' thus implying a consummated and satisfying sexual encounter with Clinton, as well as a willingness to continue a sexual relationship with him." Compl. ¶ 42. She states that the article goes on to assert that other women "appear to have been willing participants" in alleged "affairs and liaisons" with President Clinton, and that since she was one of the women "preyed upon by Clinton and his troopers, including by Defendant Ferguson, in the manner described above, those who read this magazine account could conclude falsely that [she] ('Paula') had a sexual relationship and affair with Clinton." Compl. ¶¶ 43–44.

On February 11, 1994, at an event attended by the media, plaintiff publically stated that she was the "Paula" mentioned in *The American Spectator* article, and that she had rebuffed the President's sexual advances and had not expressed a willingness to be his girlfriend. Compl. ¶ 47. She states that she and her attorney asked the President to acknowledge this incident, to state that the plaintiff had rejected his advances, and to apologize to her, but that the President responded to her request for an apology by having his press spokespersons deliver a statement on his behalf that the incident never happened and that he never met plaintiff. Compl. ¶¶ 47–48. Plaintiff further states that the President, through his White House aides, stated that her account of the hotel room incident was untrue and a "cheap political trick," and that Dee Dee Myers, then-White House Spokeswoman, said of

718

plaintiff's allegations, "It's just not true." Compl. ¶¶ 48, 50. She goes on to state that the President hired an attorney who, as the President's agent, said that her account "is really just another effort to rewrite the results of the election" and "distract the President from his agenda," and who asked rhetorically, "Why are these claims being brought now, three years after the fact?" Compl. ¶ 49. She states he also asked how her allegations could be taken "seriously." Compl. ¶ 49.

Plaintiff asserts four counts in her complaint against the President and Ferguson. Count I is a claim under 42 U.S.C. § 1983 in which the plaintiff alleges that then-Governor Clinton, acting under color of state law, deprived her of her constitutional rights to equal protection and due process under the Fifth and Fourteenth Amendments to the United States Constitution by sexually harassing and assaulting her. Compl. ¶¶ 58–65. Count II is a claim under 42 U.S.C. § 1985(3) in which the plaintiff alleges that Governor Clinton and Ferguson conspired to deprive her of her rights to equal protection of the laws and of equal privileges and immunities under the laws. Compl. ¶¶ 66–69.

Counts III and IV of the complaint are state law claims over which this Court has jurisdiction based on diversity of citizenship. In Count III, plaintiff asserts a claim of intentional infliction of emotional distress against the President, based primarily on the alleged incident at the hotel but also encompassing subsequent alleged acts. Compl. ¶¶ 70–74. In Count IV, plaintiff claims that the President, through his press aides and attorney, defamed her by denying the allegations that underlie this lawsuit and by questioning her motives, and that Ferguson defamed her by making certain comments to the press suggesting that she willingly participated in a sexual encounter. Compl. ¶¶ 75–79.

## II.

The President moves for judgment on the pleadings and dismissal of the complaint pursuant to Fed.R.Civ.P. 12(c) on the following grounds: (1) Count I fails to allege a deprivation of constitutional rights under 42 U.S.C. § 1983 premised on sexual harassment in the workplace because it fails to allege intent to deprive plaintiff of rights based on gender, actions taken under color of state law, *quid pro quo* harassment, a hostile work environment, or the deprivation of any constitutionally protected right; (2) Count II fails to allege a conspiracy to deprive constitutional rights under 42 U.S.C. § 1985(3) because it fails to allege intent to deprive plaintiff of equal protection based on gender and is based on what is at most an alleged violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, which the Supreme Court has expressly rejected as a basis for a § 1985(3) claim; (3) Count III is time-barred under the statute of limitations governing the alleged conduct and fails to allege the essential elements of a state law tort claim for intentional infliction of emotional distress; and (4) Count IV fails because it is founded on statements that are absolutely privileged, not actionable as a matter of law, and fails to allege defamation with the requisite specificity. The President argues that the plaintiff's allegations fail to state a cognizable claim under any of the four counts and that the complaint should therefore be dismissed in its entirety.

## A.

Under Fed.R.Civ.P. 12(c), a motion for judgment on the pleadings may be brought after the pleadings are closed and is to be analyzed under the same standards that would have been employed had the motion been brought as a motion to dismiss under Fed.R.Civ.P. 12(b)(6). *St. Paul Ramsey County Med. Ctr. v. Pennington County,* 857 F.2d 1185, 1187–88 (8th Cir.1988). *See also Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir.1990); James Wm. Moore et al., Moore's Federal Practice ¶ 12.38 (3d ed.1997). In considering such a motion, all facts alleged in the complaint are assumed to be true. *Doe v. Norwest Bank Minn., N.A.,* 107 F.3d 1297, 1303–04 (8th Cir.1997). The complaint should be reviewed in the light most favorable to the plaintiff, *McMorrow v. Little,* 109 F.3d 432, 434 (8th Cir.1997), and should not be dismissed unless it is clear beyond doubt that the plaintiff can prove no

set of facts thereunder which would entitle him or her to relief. *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1081, 137 L.Ed.2d 216 (1997). A motion to dismiss is not a device for testing the truth of what is asserted or for determining whether the plaintiff has any evidence to back up what is in the complaint. *ACLU Foundation of Southern California v. Barr*, 952 F.2d 457, 467 (D.C.Cir.1991). The issue is not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims, irrespective of a judge's disbelief of a complaint's factual allegations or a judge's belief that the plaintiff cannot prove what the complaint asserts. *Id. See also Hickman v. Tosco Corp.*, 840 F.2d 564, 565 (8th Cir.1988); *Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th Cir.1982). Thus, a motion to dismiss should be granted " 'as a practical matter ... only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.' " *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir.1995) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)).

## B.

### 1.

The Court first addresses the President's argument that Count I fails to allege a deprivation of constitutional rights under 42 U.S.C. § 1983 premised on sexual harassment in the workplace. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law...." Therefore, in order to state an actionable claim under § 1983, a plaintiff must show that the conduct complained of has been committed under color of state law and that this conduct worked a denial of a right secured by the Constitution or laws of the United States. *See, e.g., West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 2254, 101 L.Ed.2d 40 (1988);

*Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995); *Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir.1994).

#### a.

The President argues that Count I fails to allege the basic elements of a civil rights claim—intent and action taken under color of state law. He argues that plaintiff has failed to allege facts showing that he acted against her with the intent to deprive her of constitutionally protected rights because of her membership in a protected class, and that plaintiff has alleged no nexus between the exercise of the Governor's authority and the conduct she alleges and no control by the state over the alleged conduct. The Court has considered the matter and concludes that plaintiff's allegations are sufficient to state an actionable claim under § 1983.

##### i.

The Equal Protection Clause of the Fourteenth Amendment confers a right to be free from gender discrimination that is not substantially related to important governmental objectives. *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir.1994) (citing *Davis v. Passman*, 442 U.S. 228, 234–35, 99 S.Ct. 2264, 2271–72, 60 L.Ed.2d 846 (1979)). Applying this precept, courts have found that intentional sexual harassment of employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable under § 1983. *Id.* (citing *Pontarelli v. Stone*, 930 F.2d 104, 113–14 (1st Cir.1991), and *Bohen v. City of East Chicago*, 799 F.2d 1180, 1185 (7th Cir.1986)). *See also Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 550 (5th Cir.1997); *Whitney v. State of New Mexico*, 113 F.3d 1170, 1174 (10th Cir.1997); *Kern v. City of Rochester*, 93 F.3d 38, 43 (2nd Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1335, 137 L.Ed.2d 494 (1997). A plaintiff wishing to sustain an equal protection claim of sexual harassment under the Fourteenth Amendment must show both "sexual harassment" and an "intent" to harass based upon that plaintiff's membership in a particular class of citizens—*i.e.,* male or female. *Trautvetter v. Quick*, 916 F.2d 1140, 1149–50 (7th Cir.1990). While an individual plaintiff

720

may pursue a sexual harassment claim under the Fourteenth Amendment based solely upon acts of harassment directed towards her, such a claim must show an intent to harass because of her status as a female and not because of characteristics of her gender which are personal to her. *Id.* at 1151. *See also Bohen,* 799 F.2d at 1187; *Stafford v. State of Missouri,* 835 F.Supp. 1136, 1141 (W.D.Mo.1993).

■ In this case, the nature of plaintiff's allegations are such that it can be fairly said that the alleged actions were based on plaintiff's status as a female. Among other things, plaintiff alleges that then-Governor Clinton expressed an admiration for her "curves," attempted to kiss her in the hotel room and pulled her towards him, placed his hand on her leg and slid it toward the hem of her culottes, exposed his penis and requested that she "kiss it," hugged her in the Rotunda of the Capitol and described them as a couple, and directed a state trooper to inform her that the Governor's wife was out of town often and that the Governor would like to see her. She notes that the Governor had never met her prior to the incident in the hotel suite and that all he knew about her was, in her words, "that she was a state employee and a woman—a woman with flowing hair and nice 'curves.'" Accepting plaintiff's allegations to be true, as is required at this stage of the proceedings, it can reasonably be argued that the Governor's alleged acts were "not consistent with platonic love" but were "based on her gender and motivated by his libido." *King v. Board of Regents of the Univ. of Wis. Sys.,* 898 F.2d 533, 539 (7th Cir.1989).

This is not to say that the Governor's alleged actions would not also support a finding that such actions were because of characteristics personal to plaintiff. Indeed, the line between harassment because of gender and harassment based on factors personal to a plaintiff "becomes indistinct when those factors which are personal to an individual

include attributes of sexual attraction." *Trautvetter,* 916 F.2d at 1151. Nevertheless, plaintiff claims that his alleged acts were "because of her gender," and "sexual behavior directed at a woman raises the inference that the harassment is based on her sex." *Burns v. McGregor Elec. Indus., Inc.,* 955 F.2d 559, 564 (8th Cir.1992). *See also King,* 898 F.2d at 539 (determining that treatment of an individual based on sexual desire is sexually motivated; sexual desire does not negate intent, it affirmatively establishes it). While it remains to be seen whether plaintiff's allegations will survive a motion for summary judgment and, if so, whether she can prove these allegations at trial, the Court finds that plaintiff has sufficiently alleged that the Governor's actions were based on an intent to harass because of her status as a woman as opposed to mere characteristics which were personal to her.[3]

ii.

■ The Court also finds that plaintiff has alleged actions that were under color of state law. "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West,* 487 U.S. at 49, 108 S.Ct. at 2255 (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). *See also Parker v. Boyer,* 93 F.3d 445, 447–48 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1081, 137 L.Ed.2d 216 (1997). "[U]nder color of law means under 'pretense' of law." *Screws v. United States,* 325 U.S. 91, 111, 65 S.Ct. 1031, 1039, 89 L.Ed. 1495 (1945) (plurality opinion). A person thus acts under color of state law "when he abuses the position given to him by the State.'" *Martinez,* 54 F.3d at 986 (quoting *West,* 487 U.S. at 50, 108 S.Ct. at 2256). *See also Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 449 (1st Cir.1997) (noting that

3. Nothing in this Memorandum Opinion and Order should be construed as indicating how this Court will rule on any motion for summary judgment on the issues that remain in this case after today's decision. The standards governing motions for summary judgment under Fed.R.Civ.P.

56 are quite different from those under Fed. R.Civ.P. 12(c) and 12(b)(6), and the resolution of any such motion will depend in large part on the evidence or lack thereof that is revealed by discovery.

an act occurs under pretense of law when an individual imbued with official authority purports to exercise that authority when actually acting wholly outside of it).

The President argues that plaintiff at best complains of purely personal conduct by an individual who was also the Governor of Arkansas and that the conduct alleged in this case was nothing more than a single overture that was abandoned as soon as plaintiff stated it was unwelcome. He argues that the plaintiff has alleged no nexus between the exercise of the Governor's authority and the conduct which she alleges and that plaintiff has alleged no control by the state over the alleged conduct. Therefore, the President argues, it cannot be said that the alleged conduct of which plaintiff complains occurred under color of state law.

It is, of course, true that not every action undertaken by a person who happens to be employed by the state is thereby "under color of state law." *See, e.g., Mark v. Borough of Hatboro*, 51 F.3d 1137, 1150 (3rd Cir.) (explaining that an otherwise private tort is not committed under color of state law simply because the tortfeasor is an employee of the state), *cert. denied*, —— U.S. ——; 116 S.Ct. 165, 133 L.Ed.2d 107 (1995); *Kern*, 93 F.3d at 43 ("[m]ere employment by a state or municipality does not automatically mean that a defendant's actions are taken under the color of state law"). Indeed, "the construct—'acting under color of state law'— rarely depends on any single, easily determinable fact," such as employment status, but requires an examination of all the relevant circumstances. *Martinez*, 54 F.3d at 986. Thus, while a defendant's governmental status is certainly relevant in determining whether the defendant's actions were under color of state law, there is nevertheless no § 1983 liability if the challenged conduct is not related in some meaningful way either to the defendant's governmental status or to the performance of his or her duties. *Id.* at 986– 87. *See also Barna v. City of Perth Amboy*, 42 F.3d 809, 816 (3rd Cir.1994) (noting that a police officer's purely private acts which are not furthered by any actual or purported state authority are not acts under color of state law); *Borough of Hatboro*, 51 F.3d at

1151 (noting that "if a person's actions 'were not committed in the performance of any actual or pretended duty,' the actions were not committed under color of law"). The question for this Court, then, is whether the conduct which plaintiff alleges can be said to have been related in some meaningful way to the President's status as Governor of Arkansas or to the performance of his duties. The Court answers this question in the affirmative.

Plaintiff alleges that Governor Clinton was at the hotel on official business and that he used his position and authority as Governor to facilitate his alleged sexual harassment of her. She alleges that he summoned her to his hotel suite by a police officer who was serving as his bodyguard and who stated that the Governor would like to meet with her; that in the suite, the Governor made inquiries about her job and indicated that he had influence over her ultimate superior within the AIDC; that he then made "repugnant" and "abhorrent" sexual advances towards her and "held [her] against her will by the oppressive atmosphere of intimidation caused by the presence of the highest official of the State of Arkansas and an armed guard at the door"; that after she rejected his alleged advances, he reminded her of his influence with her superior and, in effect, instructed her to keep quiet; and that her rejection of his alleged sexual advances caused her to suffer adverse employment actions, including being transferred to a position that had no responsible duties for which she could be adequately evaluated to earn advancement and failing to receive raises and merit increases.

There can be no doubt that plaintiff's allegations describe conduct that was under color of state law. Although, as previously noted, it remains to be seen whether plaintiff will be able to sustain these allegations, she has sufficiently alleged that the President exercised power possessed by virtue of his being Governor of the State of Arkansas in committing the alleged acts and that she only came into contact with him due to his authority as Governor. Plaintiff's allegations thus satisfy § 1983's color of law requirement. *Cf. Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476 (9th Cir.1991) (concluding that a

state employee, who was employed to find refugees suitable employment, acted under color of state law where he used his government position to exert influence and physical control over refugees in order to sexually harass them); *David v. City and County of Denver*, 101 F.3d 1344, 1354 (10th Cir.1996) (applying § 1983's color of law requirement to allegations of sexual harassment based on alleged incidents that occurred when off-duty police officers who were working as security guards allegedly harassed a fellow female officer and concluding that the female officer might be able to recover if she could establish that, in committing alleged harassment, fellow officers had supervisory authority over her or in some other way exercised state authority over her), *petition for cert. filed*, 66 U.S.L.W. 3085 (June 30, 1997) (No. 97–18); *Haberthur v. City of Raymore, Mo.*, 119 F.3d 720 (8th Cir.1997) (concluding that the plaintiff raised a colorable claim that an officer's sexual assault of her was "entwined with an abuse of his police authority" and under color of state law where the officer used a police cruiser to follow her home, threatened her with tickets on two occasions, and was on duty and in uniform).

b.

The President also argues that Count I fails to set forth the essential elements of a § 1983 sexual harassment claim. As a general matter, a claim of sexual harassment under § 1983 must satisfy the contours of a sexual harassment claim under Title VII. *Trautvetter*, 916 F.2d at 1149; *Beardsley*, 30 F.3d at 529. In this regard, courts have generally separated sexual harassment claims into two categories—*quid pro quo* cases and hostile environment cases. *Kinman v. Omaha Pub. Sch. Dist.*, 94 F.3d 463, 467 (8th Cir.1996). The Court finds that Count I sufficiently alleges both categories of sexual harassment.

i.

To make a prima facie case of *quid pro quo* sexual harassment, a plaintiff must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment. *Cram v. Lamson & Sessions Co.*, 49 F.3d 466, 473 (8th Cir.1995) (citing *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 186 (6th Cir.), *cert. denied*, 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992)).

The Court finds that plaintiff has satisfied the first three factors as she is a member of a protected class, *see Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir.1996) (determining that the requirement of membership in a protected group is satisfied by showing that the plaintiff employee is a man or a woman), she sufficiently alleges she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors, *see id.* (determining that the type of conduct that may constitute sexual harassment includes sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature), and the alleged harassment can be said to have been based on her sex. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296 (3rd Cir. 1997) (determining that for purposes of establishing a *quid pro quo* violation, discrimination because of sex occurs when an employee's compensation, etc., is dependent upon submission to unwelcome sexual advances).

The primary focus of the President's argument for dismissal of plaintiff's claim of *quid pro quo* sexual harassment is directed to the fourth factor. He argues that this claim is fatally flawed because she fails to allege either a benefit offered to her or a threat made against her, fails to allege that she suffered any sort of tangible job detriment as a result of his alleged advance, and fails to allege that the Governor—who was not her immediate supervisor—communicated with her employer and thereby caused any adverse job consequences which she allegedly suffered.

The Court has previously set forth plaintiff's allegations regarding how then-Governor Clinton indicated that he had influence over her ultimate superior within the AIDC,

how he, in effect, reminded her of his influence with her superior after she rejected his alleged sexual advances by instructing her to keep quiet, and how her rejection of the Governor's alleged advances caused her to suffer adverse employment actions, including being transferred to a position that had no responsible duties for which she could be adequately evaluated to earn advancement and failing to receive raises and merit increases. Contrary to the President's assertions, then, plaintiff *has* alleged that there was a threat, *has* alleged that she suffered a tangible job detriment, and *has* alleged that there was a causal relationship between her rejection of the Governor's alleged sexual advances and the harm she allegedly suffered.[4] Whatever may become of these allegations, they suffice at this time to state a prima facie case of *quid pro quo* sexual harassment. *See Chamberlin v. 101 Realty, Inc.* 915 F.2d 777, 783 (1st Cir.1990) (concluding that it is the essence of *quid pro quo* harassment when an employee is subjected to unwelcome sexual advances by a supervisor and her reaction to these advances affects tangible aspects of her compensation, terms, conditions, or privileges of employment).

ii.

The Court also finds that plaintiff has sufficiently alleged a hostile work environment cause of action. Unlike *quid pro quo* sexual harassment, hostile work environment harassment arises when "sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Cram,* 49 F.3d at 474 (quoting *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1013 (8th Cir.1988)). To prevail on a hostile environment cause of action, a plaintiff must establish that (1) she belongs to a protected group; (2) she was subjected

to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper remedial action. *Callanan v. Runyun,* 75 F.3d 1293, 1296 (8th Cir.1996). *See also Smith v. St. Louis Univ.,* 109 F.3d 1261, 1264 (8th Cir. 1997); *Quick,* 90 F.3d at 1377. The behavior creating the hostile working environment need not be overtly sexual in nature, but it must be " 'unwelcome' in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive." *Cram,* 49 F.3d at 474 (quoting *Hall,* 842 F.2d at 1014). The harassment must also be sufficiently severe or pervasive "to alter the conditions of employment and create an abusive working environment." *Id.* (quoting *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)). *See also Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).

As was the case with plaintiff's claim of *quid pro quo* sexual harassment, the Court finds that plaintiff is a member of a protected class, that she sufficiently alleges she was subjected to unwelcome sexual harassment, and that the alleged harassment of which she complains can be said to have been based on her sex. *See Quick,* 90 F.3d at 1377. In addition, to the extent there is a dispute as to whether plaintiff has sufficiently alleged that her employer knew or should have known of the alleged harassment and failed to take remedial action, the Court finds that plaintiff's allegations are sufficient to satisfy this requirement as well.[5]

■ The President's primary argument for dismissal of plaintiff's hostile work environment claim is that aside from the supposed single incident at the Excelsior Hotel,

---

**4.** The President argues that he was not plaintiff's supervisor, or even her supervisor's supervisor, and that he could not have directly impacted her job situation without going through others. He thus argues that the sequence of events plaintiff has alleged does not establish causation. While that may prove to be the case, the Court does not presume at this time to determine how or to what extent, if any, the Governor of the State of

Arkansas could have impacted a state employee's job situation had he so desired.

**5.** Among other things, plaintiff alleges that following her rejection of the Governor's alleged advances, and as a direct result thereof, she was treated in a hostile and rude manner by her supervisors, the Governor being her ultimate supervisor.

the complaint alleges only one other contact with him, alleges only a few additional contacts with Ferguson, and contains conclusory claims that plaintiff's supervisors were rude. He argues that taken individually or as a whole, these contacts do not in any way constitute the kind of pervasive, intimidating, abusive conduct that courts require to establish a hostile work environment claim.

In assessing the hostility of an environment, a court must look to the totality of the circumstances. *Stacks v. Southwestern Bell Yellow Pages,* 27 F.3d 1316, 1327 (8th Cir. 1994). Circumstances to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. at 367. No single factor is determinative, *see id.,* and the court "should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode." *Burns,* 955 F.2d at 564. Even a single incident of sexual harassment can in some circumstances suffice to state a claim of hostile work environment sexual harassment. *See, e.g., Torres v. Pisano,* 116 F.3d 625, 631 n. 4 (2nd Cir.1997).

The Court finds that the totality of the actions alleged in this case are such that they can be said to have altered the conditions of plaintiff's employment and created an abusive work environment. In addition to what is alleged to have occurred in the hotel suite, plaintiff alleges that she was subjected to additional encounters with Ferguson and the Governor, including being "accosted" in the Rotunda of the State Capitol. She claims that following her rejection of the Governor's alleged sexual advances, her enjoyment of her work was "severely diminished," she was treated in a hostile and rude manner by supervisors, and, as previously noted, her rejection of the Governor's alleged advances caused her to suffer adverse employment actions, including being transferred to a position that had no responsible duties for which she could be adequately evaluated to earn advancement and failing to receive raises and merit increases. She further claims that these alleged actions and omissions caused her, among other things, embarrassment, humiliation, fear, emotional distress, horror, grief, and shame. Although the President's argument regarding the inadequacy of plaintiff's hostile work environment claim is not without some force, the question of whether alleged harassment is sufficiently severe or pervasive for purposes of establishing hostile work environment is "quintessentially a question of fact," *see Beardsley,* 30 F.3d at 530 (citation omitted), and one the Court simply cannot resolve on this record. Plaintiff's allegations as they now stand state a hostile work environment claim. *See Quick,* 90 F.3d at 1378 (noting that a discriminatorily abusive work environment may exist where the harassment caused economic injury, affected the employee's psychological well-being, detracted from job performance, discouraged an employee from remaining on the job, or kept the employee from advancing in her career).

c.

For his final argument under Count I, the President argues that plaintiff fails to state an actionable due process claim as she has failed to allege a cognizable property loss, failed to allege deprivation of a protected liberty interest in reputation, and failed to allege a deprivation of a protected liberty interest arising from alleged false imprisonment. The Court agrees in all respects.

i.

The Court first addresses plaintiff's claim that she was deprived of the substantive due process right to bodily integrity. The President argues that this claim was raised for the first time in her response to his motion for judgment on the pleadings and is therefore not properly before the Court. It is not necessary for the Court to resolve that question, however, as the Court finds that plaintiff's allegations do not support such a claim.

In *Haberthur v. City of Raymore, Mo.,* 119 F.3d 720, 723 (8th Cir.1997), the Eighth Circuit concluded that a person's substantive due process right to bodily integrity or privacy may be violated by "sexual fondling and touching or other egregious sexual contact." *Haberthur* involved a situation in which the

alleged perpetrator, a police officer who had used the City's police cruiser to follow plaintiff home and threaten her with tickets on two occasions, "reached his hand underneath [the plaintiff's] shirt and fondled a private erogenous area and moved his hands along and caressed her body while making sexually suggestive remarks." *Id.* at 724. The court noted that this conduct "was intrusive, demeaning, and violative of her personal integrity," and that "[t]he implication for further sexual contact was in the larger context of threatening adverse official action by way of a ticket and following her in his police car." *Id.* In recognizing that such a sexual assault can be a constitutional violation under § 1983, the court relied on decisions of other courts of appeal that have addressed this type of constitutional injury. *See Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 727 (6th Cir.1996) (concluding that a teacher's fondling a student's breast may violate the substantive due process right to bodily integrity); *McWilliams v. Fairfax County Bd. of Supervisors,* 72 F.3d 1191, 1197 (4th Cir.) (determining that the substantive due process right against unreasonable bodily intrusions was violated when an employee was forced to his knees, a finger was inserted in his mouth, and a broomstick placed next to his clothed buttocks, and he was sexually fondled), *cert. denied,* — U.S. —, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996); *Sepulveda v. Ramirez,* 967 F.2d 1413, 1415–16 (9th Cir. 1992) (concluding that a parole officer was not entitled to qualified immunity for depriving a woman of her clearly established due process right to bodily privacy by entering a bathroom stall and watching her urinate), *cert. denied,* 510 U.S. 931, 114 S.Ct. 342, 126 L.Ed.2d 307 (1993).

The Eighth Circuit's decision in *Haberthur* establishes that an actionable claim for the substantive due process right to bodily integrity requires that there be some type of "sexual fondling and touching or other egregious sexual contact." But no such conduct is alleged here. The conduct that plaintiff does allege in support of this claim—that the Governor asked plaintiff to go to a place where sex would be possible, that he exposed *himself,* and that he possessed ongoing authority over her—may in conjunction with additional alleged conduct suffice to state other claims under state and federal law, and indeed the Court today so finds, but it does not rise to the level necessary to state a claim for violation of the substantive due process right to bodily integrity or privacy. Plaintiff simply has not alleged conduct that could be characterized as "egregious sexual contact" nor has she alleged any other type of "egregious" conduct, such as that present in *Sepulveda* where the victim was forced to expose herself. Accordingly, this claim would be dismissed regardless of whether it was properly before the Court. *Cf. Reeve v. Oliver,* 41 F.3d 381 (8th Cir.1994) (determining that a woman's claim that a police officer responding to her complaint about barking dogs had twice rubbed her back and stared at her chest failed to state an actionable substantive due process violation) (per curiam).

ii.

■ The Court also rejects plaintiff's claim that she suffered a denial of her property interest in her state job. Protected property interests are created by state law. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). Such interests typically arise from contractual, regulatory, or statutory provisions which constrain the employer from taking certain actions or which confer a benefit. *See, e.g., Winegar v. Des Moines Indep. Community Sch. Dist.,* 20 F.3d 895, 899 (8th Cir.), *cert. denied,* 513 U.S. 964, 115 S.Ct. 426, 130 L.Ed.2d 340 (1994); *Blankenbaker v. McCook Pub. Power Dist.,* 940 F.2d 384, 385 (8th Cir.1991); *Mangan v. Cullen,* 870 F.2d 1396, 1400 (8th Cir.1989). When a protected property interest exists, the employee is entitled to a hearing or some related form of due process before being deprived of the interest. *Winegar,* 20 F.3d at 899 (citing *Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493).

Plaintiff's claim that she suffered a property loss is premised on her assertion that she feared for the loss of her job as a result of the Governor's alleged actions. She claims she "was entitled to due process protection of

freedom from arbitrary action which jeopardized her property interest in her public employee job in that she should not have been subjected arbitrarily to the fear of losing that job or of having to provide sex to the Governor as a *quid pro quo* for keeping the job." She goes on to claim that "she should not have been subjected arbitrarily to the fear of losing the enjoyment of a proper and pleasant work environment, or to other adverse actions which she feared and which deprived her of the proper enjoyment and efficiency of her work." But even assuming plaintiff's fear of job loss was justified (which it may well have been if the allegations of her complaint are true), and even if her fear of other adverse actions deprived her of "the proper enjoyment and efficiency of her work," it is undisputed that plaintiff was never deprived of her employment with the AIDC but instead voluntarily quit her job in order to move to California. Plaintiff has cited no authority, state or federal, for the proposition that fear of job loss without any actual deprivation gives rise to a protected property interest.

▪ Moreover, even if plaintiff had alleged that she actually lost her job, she would not be entitled to relief as an employee in Arkansas generally does not have a constitutionally protected interest in his or her employment. *See, e.g., Black v. Barnett,* 999 F.2d 1295, 1296 (8th Cir.1993) (determining that a state employee generally has no property interest in a state job) (per curiam); *Drake v. Scott,* 823 F.2d 239, 242 (8th Cir.) (concluding that no property interest exists in state employment absent an express provision that discharge will not be without cause), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987). Plaintiff has not identified any statute, contract, document, or other authority that would remove her case from within the purview of this general rule.

▪ To the extent plaintiff is asserting she was deprived of a protected property interest in certain job benefits, such as a particular job assignment within the AIDC or an opportunity for promotions and pay raises, this claim too is without merit.[6] In order to have a property interest in a benefit, a plaintiff "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Plaintiff has pointed to nothing in Arkansas law that entitles her, in a constitutional sense, to a particular job assignment within the AIDC, and she has not identified any contract or other document that would give her entitlement to a promotion or pay raise.

Plaintiff does direct this Court's attention to two statutes, Ark.Code Ann. §§ 21-5-209 and 21-5-211, which she states supports her claim. The Court has examined these statutes and can find nothing in their provisions that would give rise to a protected property interest in promotions or pay raises. Ark. Code Ann. § 21-5-209 merely establishes a compensation plan for state agencies and institutions for the setting of salaries and salary increases where such increases are "deserved." Indeed, this statute specifically provides that "it is not the intent [of the General Assembly] that any pay increases shall be automatic or that any employee shall have a claim or right thereto unless the department head of the agency or the institution shall determine that the employee, by experience, ability, and work performance, has earned the increase in pay authorized for the appropriate rate." Ark.Code Ann. § 21-5-209(c). Similarly, Ark.Code Ann. § 21-5-211 merely establishes an implementation procedure for grade changes and does not grant any entitlement to a salary increase. In fact, the statute repeatedly refers to an employee's "eligibility" for salary adjustments and merit increases based upon "satisfactory" performance ratings. Such language can hardly be construed as creating an entitlement in any benefits of the type that plaintiff here claims.

It is of no import that these statutes may establish a range within which an employee's salary must fall as such a requirement does

---

6. Although mentioned in the context of her hostile work environment claim, this claim does not appear to have been raised as a separate cause of action. Nevertheless, the Court addresses this claim for purposes of full review.

not give rise to a protected property interest in a salary increase. *See Mangan,* 870 F.2d at 1400 (determining that there can be no legitimate claim of entitlement to a salary increase where the only restriction placed on discretion in setting the salary is that the salary fall within a certain prescribed range). Although plaintiff may not have been paid more money after her transfer than she received in her previous position, she does not dispute that her salary at all times fell within the prescribed range. That being so, and because plaintiff has not identified any other source of state law that would entitle her to a particular job assignment or an opportunity for promotions and pay raises, plaintiff's claim that she was deprived of a property interest in such benefits must be rejected.[7] *Cf. Lowe v. Kansas City, Mo. Bd. of Police Comm'rs,* 841 F.2d 857, 858 (8th Cir.1988) (affirming the dismissal of a complaint for failure to state a claim and rejecting a claim of deprivation of property interest in wages, benefits, and loss of opportunities for transfers and/or promotions where the plaintiff's salary had not been diminished and "[a]ny loss in status or wages claimed by [plaintiff was] purely speculative").

### iii.

■ The Court also concludes that plaintiff has failed to allege deprivation of a protected liberty interest in reputation. It is true that the Supreme Court has recognized a protected due process liberty interest in reputation where an employee's "good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Mascho v. Gee,* 24 F.3d 1037, 1039 (8th Cir.1994) (quoting *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707). To prevail on such a claim, however, a plaintiff "must show defamation by a state official, and that the defamation occurred in the course of the termination of employment." *Id.* (citing *Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976)). For purposes of a due process claim, defamation occurs when a state official publically makes allegedly untrue charges against the employee that would stigmatize her so as to seriously damage her standing and associations in her community and foreclose her freedom to take advantage of other employment opportunities. *Id.* (citing *Shands v. City of Kennett,* 993 F.2d 1337, 1347 (8th Cir.1993), *cert. denied,* 510 U.S. 1072, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994)). *See also Johnson v. City of West Memphis,* 113 F.3d 842, 843 (8th Cir.1997) (determining that an employee's liberty interests are implicated when, in connection with the employee's discharge, a government official makes accusations that seriously damage the employee's standing in the community or foreclose other employment opportunities); *Waddell v. Forney,* 108 F.3d 889, 895 (8th Cir. 1997) (same).

Plaintiff's claim for deprivation of a protected liberty interest in reputation is based on Governor Clinton's alleged statement that he and the plaintiff made "a beautiful couple" and on certain as yet unidentified statements that she states she "expects" to prove the Governor published to others regarding her actions in the hotel suite on May 8, 1991. Even assuming such statements were made, however, it is undisputed that these statements did not occur in the course of any termination of plaintiff, and it has not been alleged, nor can it be inferred from the allegations of the complaint, that such statements foreclosed any employment opportunities for plaintiff. Indeed, as previously noted, plaintiff voluntarily quit her job in order to move to California. That being the case, and because "it is well established that defamation or injury to reputation by itself does not state a constitutional deprivation," *Brayman v. United States,* 96 F.3d 1061, 1066 (8th Cir.1996), plaintiff has not stated an actionable claim for deprivation of a due process liberty interest in her reputation.

### iv.

■ Finally, the Court finds that plaintiff does not state a claim for deprivation of a protected liberty interest arising from alleged false imprisonment. Plaintiff's claim on this point, which she characterizes as "clear notice of a valid claim of false impris-

7. The circumstances of plaintiff's employment, including her transfer and alleged denial of an opportunity for promotions and pay raises, may well be relevant to other claims in her lawsuit, however.

onment under color of state law," is based on her assertion that she was lured to the hotel suite on the day in question for different purposes than she was led to believe and was held there "against her will by the oppressive atmosphere of intimidation caused by the presence of the highest official of the State of Arkansas and an armed guard at the door." However, as noted in *Gregory v. City of Rogers*, 974 F.2d 1006, 1009 (8th Cir.1992), *cert. denied*, 507 U.S. 913, 113 S.Ct. 1265, 122 L.Ed.2d 661 (1993), "[m]any harms, though caused by a state actor, do not fall within the scope of section 1983, for section 1983 does not turn the Fourteenth Amendment into a font of tort law that supercedes the tort systems already available under individual state laws." In this regard, the Supreme Court, in *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), held that § 1983 does not provide a remedy for false imprisonment, stating as follows:

> Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles. Just as "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official.

443 U.S. at 146, 99 S.Ct. at 2695–96 (citation omitted).

With the Supreme Court's decision in *Baker*, "the law is now sufficiently clear that careful lawyering should divert the ordinary false arrest and false imprisonment cases to the state courts where they belong." *Edwards v. Baer*, 863 F.2d 606, 607 (8th Cir. 1988). Plaintiff's claim falls within this category.

Although plaintiff states that "this is hardly an ordinary case of false imprisonment," the President argues, and this Court agrees, that plaintiff's claim would not suffice to survive a motion to dismiss under state law. Her own complaint alleges that she voluntarily and willingly went to the hotel suite, that the Governor told her, "I don't want to make you do anything you don't want to do," and that she then simply walked out of the hotel suite. Plaintiff's allegations plainly do not demonstrate the type of "detention" required under state law, *see Grandjean v. Grandjean*, 315 Ark. 620, 869 S.W.2d 709, 711 (1994) (defining false imprisonment as the "unlawful violation of the personal liberty of another, consisting of detention without sufficient legal authority"), nor is there any allegation that plaintiff was threatened with physical restraint or otherwise required to stay against her will. The Court therefore grants the President's motion for dismissal with respect to plaintiff's claim for false imprisonment.

2.

█ The Court next addresses the President's argument that Count II fails to state an actionable § 1985(3) claim. In order to prove the existence of a civil rights conspiracy under § 1985(3), a plaintiff must prove that: (1) the defendants did conspire; (2) such conspiracy was for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or equal privileges and immunities under the laws; (3) one or more of the conspirators did, or caused to be done, any act in furtherance of the object of the conspiracy; and (4) another person was injured in his person or property or deprived of having and exercising any right or privilege of a citizen in the United States. *Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir.1996) (en banc). *See also Andrews v. Fowler*, 98 F.3d 1069, 1079 (8th Cir.1996). The President argues that Count II fails to allege intent to deprive plaintiff of equal protection based on gender and is based on what is at most an alleged violation of Title VII. The Court disagrees with both of these arguments.

a.

The "purpose" element of a conspiracy claim under § 1985(3) requires that the plaintiff prove a class-based "invidiously discriminatory animus." *Larson*, 76 F.3d at 1454 (quoting *City of Omaha Employees Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir.1989)). "Moreover, the plaintiff must allege with particularity and

specifically demonstrate with material facts that the defendants reached an agreement." *Id.* The plaintiff can satisfy this burden by pointing to at least some facts which would suggest that the defendants "reached an understanding" to violate her rights. *Id. See also Andrews,* 98 F.3d at 1079–80 (determining that the plaintiff must demonstrate discriminatory purpose by showing that the defendants selected the particular course of action because of and not merely in spite of its adverse effects upon an identifiable group).

Plaintiff has satisfied the intent requirement of § 1985(3) in this case as women are a protected class falling within the ambit of the protections afforded by § 1985(3), *see Libertad v. Welch,* 53 F.3d 428, 449 (1st Cir.1995), and the Court has already determined that plaintiff sufficiently alleges that the Governor's alleged actions were based on an intent to harass because of her status as a woman as opposed to mere characteristics which were personal to her. As plaintiff has also alleged at least some facts which would suggest that the defendants "reached an understanding" to violate her equal protection rights, the Court finds that plaintiff states an actionable § 1985(3) claim.

### b.

The Court also finds that Count II alleges more than a mere violation of Title VII. The President argues that absent any alleged facts to support a finding that the defendants acted with the intent to deprive plaintiff of her civil rights, her complaint alleges at most a violation of Title VII, which prohibits sex discrimination and sexual harassment in employment. While it is true that the Supreme Court has expressly held that § 1985(3) may not be invoked to redress violations of Title VII, *see Great Am. Fed. Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 378, 99 S.Ct. 2345, 2352, 60 L.Ed.2d 957 (1979), the Court has already determined that plaintiff sufficiently alleges intent to deprive her of her equal protection rights based on her gender. Thus, the President's argument on this point

provides no basis for dismissing Count II of the complaint.

### 3.

The Court next addresses the President's argument that Count III of plaintiff's complaint fails to state an actionable claim of intentional infliction of emotional distress. Arkansas recognizes a claim of intentional infliction of emotional distress based on sexual harassment. *Davis v. Tri–State Mack Distribs., Inc.,* 981 F.2d 340, 342 (8th Cir.1992) (citing *Hale v. Ladd,* 308 Ark. 567, 826 S.W.2d 244 (1992)). To establish a claim of intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous and utterly intolerable in a civilized community; (3) the defendant's conduct was the cause of the plaintiff's distress; and (4) the plaintiff's emotional distress was so severe in nature that no reasonable person could be expected to endure it. *Milam v. Bank of Cabot,* 327 Ark. 256, 937 S.W.2d 653, 658 (1997); *Hollomon v. Keadle,* 326 Ark. 168, 931 S.W.2d 413, 415 (1996); *Cherepski v. Walker,* 323 Ark. 43, 913 S.W.2d 761, 767 (1996); *Croom v. Younts,* 323 Ark. 95, 913 S.W.2d 283, 286 (1996).[8] The Court finds that plaintiff's allegations are sufficient to state an actionable claim for the tort of intentional infliction of emotional distress.

The President argues that plaintiff's factual allegations plainly purport to state claims for assault, battery, false imprisonment, spoken words, and harassment under state law, and that claims based on such conduct are governed by the one year statute of limitations forth in Ark.Code Ann. §§ 16–56–104; 5–1–109. He argues that because the alleged actions of which plaintiff complains occurred no later than February 1993 and the complaint was not filed until May 1994, plaintiff's claim in Count III of the complaint is time-barred and she cannot evade the governing

8. Under Arkansas law, the tort of intentional infliction of emotional distress and the tort of outrage are essentially the same causes of action and are governed by the same standards. *See, e.g., Hamaker v. Ivy,* 51 F.3d 108, 110 n. 2 (8th Cir.1995); *Ross v. Patterson,* 307 Ark. 68, 817 S.W.2d 418, 420 (1991). Accordingly, this Court has looked to cases discussing both torts for guidance in addressing the issues presented by the President's motion.

time-bar by labeling her claim "intentional infliction of emotional distress."

 It is true that a complaint simply saying that the lawsuit is one for a particular cause of action does not make it so. *See Dunlap v. McCarty*, 284 Ark. 5, 678 S.W.2d 361, 363 (1984). In cases raising questions regarding the nature of the cause of action, the Court must look to the facts alleged in the complaint to determine the true nature of the cause of action and whether the action is time-barred. *Id.* "If there is doubt as to which of two or more statutes of limitation applies to a particular action or proceeding, and it is necessary to resolve the doubt, it will generally be resolved in favor of the application of the statute having the longest limitation." *Jefferson v. Nero*, 225 Ark. 302, 280 S.W.2d 884, 886 (1955).

Although it may well be the case that the alleged conduct of which plaintiff complains could fall within the rubric of other legal theories, there can be no doubt that such conduct is also encompassed by the tort of intentional infliction of emotional distress. The Arkansas Supreme Court has held that one is subject to liability for the tort of outrage or intentional infliction of emotional distress if he or she wilfully or wantonly causes severe emotional distress to another by extreme and outrageous conduct. *Sterling Drug Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380, 382 (1988). *See also Ingram v. Pirelli Cable Corp.*, 295 Ark. 154, 747 S.W.2d 103, 105 (1988). In *M.B.M. Co. v. Counce*, 268 Ark. 269, 596 S.W.2d 681 (1980), the Arkansas Supreme Court stated that "[b]y extreme and outrageous conduct, we mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in

civilized society." *Id.* 596 S.W.2d at 687. The Court has previously detailed the alleged conduct on which plaintiff bases her lawsuit and will not repeat those allegations here. Suffice it to say that such conduct, if true, could well be regarded as atrocious and utterly intolerable for purposes of establishing à claim for the tort of intentional infliction of emotional distress. As this claim was also filed within the applicable three-year statute of limitations for such a claim, *see O'Mara v. Dykema*, 328 Ark. 310, 942 S.W.2d 854, 858 (1997), the Court denies the President's motion for dismissal of Count III.[9]

### 4.

 Lastly, the Court addresses the President's argument that plaintiff's defamation claim in Count IV fails because it is founded on statements that are absolutely privileged, not actionable as a matter of law, and fails to allege defamation with the requisite specificity. The Court agrees with the President that the statements at issue in this case are absolutely privileged as a matter of law and, therefore, grants the President's motion for dismissal of this claim on that basis.

### a.

 Statements made prior to the commencement of judicial proceedings are absolutely privileged if made in connection with possible litigation. Rodney A. Smolla, Law of Defamation § 8.03[1][b] and [c] (1996). Arkansas recognizes this privilege, *see Pinkston v. Lovell*, 296 Ark. 543, 759 S.W.2d 20 (1988); *Selby v. Burgess*, 289 Ark. 491, 712 S.W.2d 898 (1986), and it covers statements made by both attorneys and parties to the possible litigation. Smolla, *supra*, Law of Defamation § 8.03[1][b] and [c].[10] The privi-

---

**9.** In concluding that plaintiff has stated an actionable claim for the tort of intentional infliction of emotional distress, the Court is entirely cognizant of the fact that the Arkansas Supreme Court takes a strict approach and gives a narrow view to such claims, *see, e.g., Milam*, 937 S.W.2d at 658; *Croom*, 913 S.W.2d at 287, and that merely describing conduct as outrageous does not make it so. *Ross*, 817 S.W.2d at 420. Nevertheless, judgments for outrage or intentional infliction of emotional distress have been sustained and complaints upheld as stating such claims in Arkansas cases involving sexual harassment, *see, e.g.,*

*Mumphrey v. James River Paper Co., Inc.*, 777 F.Supp. 1458, 1463 (W.D.Ark.1991) (citing *Lucas v. Brown & Root, Inc.*, 736 F.2d 1202, 1206–07 (8th Cir.1984)), and *Tri–State Mack Distrib.*, 981 F.2d 340 (citing *Ladd*, 308 Ark. 567, 826 S.W.2d 244), and the Court is unable to conclude at this time that plaintiff will be unable to sustain such a claim in this case.

**10.** The Restatement (Second) of Torts § 586 provides that "[a]n attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a

lege is narrowed closely by "relevancy" and "pertinency" requirements, however, and does not cover the publication of defamatory matter that has "no connection whatever" with the possible litigation. *Pinkston,* 759 S.W.2d at 23. Therefore, the two questions for this Court are (1) whether the statements of which plaintiff complains were made prior to possible litigation, and (2) whether these statements can be said to have had some connection with the possible litigation.

There can be no doubt that the statements at issue in this case were made prior to possible litigation as it was less than three months prior to the filing of the complaint that plaintiff and her attorney, at an event attended by the media, publically asked the President to acknowledge the alleged incident that is the subject of this lawsuit, to state that the plaintiff had rejected his advances, and to apologize to her. The President did in fact respond to the plaintiff's allegations and hired an attorney, and this lawsuit soon followed. Given these circumstances, the Court has no difficulty in concluding that the statements of both the White House aides and the President's attorney were made prior to possible litigation for purposes of the privilege. *Cf. McBride v. Pizza Hut, Inc.,* 658 A.2d 205 (D.C.1995) (concluding that the plaintiff's threat of suit constituted a proposed judicial proceeding under § 586 of Restatement and that the defense attorney's letter containing a defamatory statement written in reply to the plaintiff's demand for a retraction of the charges of impropriety was therefore absolutely privileged).

The Court also concludes that these statements had at least some connection with the possible litigation as they did not go beyond

that of simply responding to plaintiff's allegations with a general denial and questioning her motives. Indeed, the statements which plaintiff claims are defamatory are essentially the same statements contained in the President's answer to the complaint, which no one disputes are absolutely privileged as statements made in pleadings. *See, e.g., Selby,* 712 S.W.2d at 900 (determining that an attorney has an absolute privilege to make statements in pleadings regardless of their truth or the existence of actual malice on the part of the attorney so long as the statements are relevant and pertinent to the pleadings). That being so, and given the timing and nature of both the plaintiff's allegations and the statements in response, the Court cannot say that these statements had "no connection whatever" to the possible and now pending litigation. *Pinkston,* 759 S.W.2d at 23.

In concluding that the statements at issue in this case are absolutely privileged, the Court is not saying that there can never be actionable defamation made in response to allegations of wrongdoing. As previously noted, the privilege on which this Court bases its decision is subject to and narrowed by "relevancy" and "pertinency" requirements. *Pinkston,* 759 S.W.2d at 23; *Selby,* 712 S.W.2d at 900. And, it is certainly true as a general matter that there is no absolute privilege to make defamatory statements to the news media when the news media is unconnected with a proposed judicial proceeding. *See Scott Fetzer Co. v. Williamson,* 101 F.3d 549, 554 (8th Cir.1996) (citations omitted). But where, as here, the challenged statements were nothing more than mere denials of the allegations and the questioning of plaintiff's motives (both of which mirror the

proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." In both *Pinkston,* 296 Ark. 543, 759 S.W.2d 20, and *Selby,* 289 Ark. 491, 712 S.W.2d 898, the Arkansas Supreme Court adopted the principles set forth in § 586 of the Restatement. *See also Pogue v. Cooper,* 284 Ark. 202, 680 S.W.2d 698 (1984). Section 587 of the Restatement closely mirrors § 586 and provides that "[a] party to a private litigation ... is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a

proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding." The Arkansas Supreme Court does not appear to have addressed the privilege in the context of statements made by parties to the possible litigation as opposed to attorneys. Nevertheless, considering the similarity of § 586 and § 587, and considering that attorneys are generally nothing more than agents of the parties, this Court has no doubt that in the proper case (this being one of them), the Arkansas Supreme Court would adopt § 587 of the Restatement as it has adopted

statements contained in the answer to the complaint), and where such statements were only made following an event attended by the media in which the plaintiff and her attorney publically solicited a response from the party to whom the allegedly defamatory statements are attributed and then filed a lawsuit less than three months later, the Court has no hesitation in concluding that such statements qualify as statements made prior to and in connection with possible litigation and are therefore absolutely privileged. *Cf. Johnston v. Cartwright,* 355 F.2d 32, 37 (8th Cir.1966) (determining that under Iowa law, an allegedly defamatory statement in a newspaper was absolutely privileged where the statement was made in the heat of controversy, where an accusation of falsity and a challenge to prove had been made, and where all signs pointed to incipient litigation and to the necessity of protective action).

b.

■ Even were the Court to conclude that the statements of which plaintiff complains were not absolutely privileged, the fact that they were solicited by plaintiff precludes her from claiming in this lawsuit that she was thereby defamed. "It is axiomatic that 'invited defamation,' or the issuance of a defamatory statement wherein the injured party precipitated the statement's release, is not actionable." *Litman v. Massachusetts Mut. Life Ins. Co.,* 739 F.2d 1549, 1560 (11th Cir. 1984). *See also Williams v. School Dist. of Springfield,* 447 S.W.2d 256, 269 (Mo.1969) ("One who has invited or instigated the publication of defamatory words can not be heard to complain of the resulting damage to his reputation"); *Kelewae v. Jim Meagher Chevrolet, Inc.,* 952 F.2d 1052, 1055 (8th Cir.1992) (determining that under Missouri law, allegedly defamatory statements cannot form the basis of a defamation suit where statements are solicited by agents of plaintiff). Here, plaintiff invited the President's response to her allegations from a public forum and she cannot now be heard to complain that the responses issued in his behalf (to the extent

they can be characterized as defamatory) were improper.[11] *Cf. Patton v. Cruce,* 72 Ark. 421, 425, 81 S.W. 380 (1904) ("If one's good name and character is assailed in a newspaper, he may, of course, reply, and defend himself, and if his reply is made in good faith, without malice, and is not unnecessarily defamatory of his assailant, the reply will be privileged").

III.

For the foregoing reasons, the Court finds that President Clinton's motion for judgment on the pleadings and to dismiss the complaint should be and hereby is granted in part and denied in part. The Court grants the President's motion with respect to plaintiff's due process claims in Count I of the complaint and with respect to her defamation claim against the President in Count IV. The Court denies the President's motion in all other respects. This case will go forward with respect to plaintiff's § 1983 sexual harassment claim against the President in Count I, her § 1985(3) conspiracy claim against the President and Ferguson in Count II, her state law claim for the tort of intentional infliction of emotional distress against the President in Count III, and her defamation claim against Ferguson in Count IV.

---

§ 586 and apply the privilege to statements made by a party to the possible litigation.

**11.** Plaintiff acknowledges that the statements made by members of the White House staff were in response to her request for an apology from the President. *See* Plaintiff's Mem. in Opp'n to the Mot. of Def. William Jefferson Clinton for Judgment on the Pleadings, at 66. As to the statements made by the President's attorney, the Court finds that these statements were likewise precipitated by and in response to plaintiff's public allegations.